JUDE G. GRAVOIS, Judge.
|2Pefendant, Clint Brenckle, appeals his conviction of two counts of sexual battery upon known juveniles. On appeal, he argues that the evidence was insufficient to convict him, that the trial court erred in granting the State’s motion in limine to prevent his introduction of one of the victim’s past allegedly false allegations of sexual abuse, and finally that his sentences are unconstitutionally excessive. Finding no merit to defendant’s’arguments, we affirm his convictions and sentences.

PROCÉDURAL HISTORY

On June 27, 2013, the Jefferson Parish District Attorney’s Office filed a bill of information charging defendant with two counts of sexual battery upon known juveniles (D.O.B. 12/1/07 and 12/18/06), wherein each child was under the age of thirteen, in violation of La. R.S. 14:43.1. On June 28, 2013, defendant appeared for arraignment and pled not guilty.
The State filed a motion in limine to prevent the admissibility of testimony regarding unrelated allegations, which the trial court granted. Trial was held on I,.¡March 13-14, 2014. A twelve-person jury returned a verdict against defendant of guilty as charged as to both counts of sexual battery upon known juveniles.
On March 26, 2014, defense counsel filed a “Motion for New Trial and Alternatively to Arrest the Judgment,” which was denied. On March 27, 2014, the trial court sentenced defendant to imprisonment at hard labor for a term of 40 years on each count, to be served concurrently, without the benefit of parole, probation, or suspension of sentence. That same day, defendant’s motion to reconsider sentence was denied. He filed a motion to appeal, which was granted.

FACTS

This case involves allegations against defendant of sexual battery made by two victims, C.H. and M.B.,[1] both under the age of thirteen.
*1144 A.L., C.H.’s mother, testified that C.H. was seven years old at the time of trial and his father did not play an active role in his life. She testified that she met defendant at the First Pentecostal Church on Ames Boulevard approximately two years prior to trial, and that they were just friends. She never had an intimate relationship with defendant, but at one point, “Brother Bryan” from the church called and told her that defendant was about to be homeless and asked if she could offer him a place to live. She agreed, and defendant stayed inside her home for approximately two to three months. When defendant was staying with her, he would babysit C.H., and thus was left alone with him.
On October 25, 2012, A.L. was having dinner with friends and C.H. was with her. A.L. testified that her “friend’s little boy came downstairs and said that [C.H.] went to put his penis by his anus.” She confronted C.H. and he “said that he had learned it from [defendant].” C.H. told her that he “had touched [defendant’s] |4penis” and “[defendant] had touched [C.H.’s] penis in the car at Piggly Wiggly.” A.L. testified that C.H. did not actually use the word “penis,” but he “refers to his penis as his ‘weenie.’ ” She testified that she called both 9-1-1 and defendant. She asked defendant why her son told her that defendant had touched him, and defendant denied it. - She told defendant she was about to call the police, and defendant told her “[w]ell, when they leave, call me and let me know what happens.” That was the last time A.L. spoke with defendant. A.L. then called the police, and both she and C.H. spoke with Deputy Christopher Bas-sil and Detective David Canas, and it was arranged for C.H. to be brought to the Children’s Advocacy Center (“CAC”). Later, she also brought C.H. to the Tulane Autism Center, where he was diagnosed with Asperger’s Syndrome.[2]
Dr. Elbe Wetsman, a child abuse pediatrician who worked as an independent contractor for Children’s Hospital, was accepted by the court as an expert in the field of Pediatrics, Pediatric Forensic Medicine, and Child Sexual Abuse. Dr. Wetsman testified that she personally examined and took a history from C.H. in December of 2012. She testified that his history was consistent with a “delayed disclosure” of sexual abuse, especially because he did not want to tell her everything, and said, “I can’t tell you, because you’re going to freak out.” Dr. Wetsman showed C.H. a diagram of an outline of a- person and asked C.H. to point out where he was touched; C.H. pointed to the genitals. In Dr. Wetsman’s opinion, everything she learned from C.H. through his physical examination and through taking his history was consistent with a delayed disclosure of sex abuse.[3]
|5On cross-examination, Dr. Wetsman testified that she has testified in numerous criminal matters, each time for the prosecution. She stated that C.H. never gave her defendant’s name, and that she could not testify that defendant was the individual who touched or manipulated C.H.
Detective David Canas testified that in October of 2012, he was assigned to the Personal Violence Division with the Jefferson Parish Sheriffs Office. On October *1145 25, 2012, he responded to a call on the comer of Power and Kawanee and the victim advised that “he was touched in his private part.” He met with the victim, C.H., and his mother, A.L., in the Rouse’s parking lot, and after speaking with them, he developed defendant as a potential suspect.
Detective Canas learned that the abuse was sexual abuse by touching the victim’s penis area. He spoke with C.H., who told him that defendant had touched his “pee-pee.” C.H. pointed to the area between his legs. Detective Canas testified that C.H. was very consistent in his claim that he was “touched on the penis area.”
Detective Canas testified that because he had difficulty finding a consistent address for defendant, he called him on the phone, and defendant came to the Detective Bureau. When defendant came in, Detective Canas advised him of his Miranda [4] rights and that he was conducting an investigation. Defendant elected to give a recorded statement, but he was not arrested and Detective Canas continued to build the case.
Detective Canas later became aware of an additional case involving defendant and another child. He testified that the two cases had a lot of similarities, from the age of the children to where they were touched, and ^defendant knowing their mothers and being friends with the families. Defendant was the perpetrator indicated by both children.
On cross-examination, Detective Canas testified that C.H.’s initial disclosure was “a little inconsistent.” He testified that C.H. said that another little boy learned that game about exposing his penis from defendant, but Detective Canas learned that the little boy did not know defendant. C.H. also at one point stated that defendant put his mouth on his “pee-pee,” but when the detective attempted to clarify that statement, C.H. said, “No, no, no, like this.” Detective Canas also testified that C.H. provided different accounts of whether defendant’s pants were on or off. Detective Canas testified that when defendant came to the Detective Bureau, he denied sexually touching C.H., but said “he touched [C.H.] to help him zip up his pants.”
At trial, C.H. testified that he was seven years old and in the first grade. The video of C.H.’s forensic interview was published and viewed in open court. C.H. testified that what he said in the video about where defendant touched him was the truth, and defendant touched him “[i]n the middle.”
In the CAC interview, C.H. said that “Clint” touched him down there and pointed between his legs and said he was touched at the front part between his legs. When C.H. was asked what the front part between his legs was called, he said he could not tell it to girls because they would “freak out.” C.H. then said he' did not know what the part was called, but it is the part that “pee-pees.” C.H. said defendant only used his hand to touch him. C.H. said defendant touched him one time. C.H. then said the part where defendant touched him is called a “weiner.” When defendant touched his “weinee,” C.H. was wearing clothes. C.H. then said defendant touched the “skin” of his “weinee,” but C.H. did not know how defendant touched the skin. C.H. said they were in defendant’s car with “Cheesy-lPuff,”7 who was defendant’s male adult friend. When defendant touched C.H.’s “weinee,” C.H. said “Cheesy-Puff’ was in the store and he and defendant were in the car. C.H. said the car was at the store. C.H. said no one saw *1146 defendant touch his “weinee.” C.H. said that defendant did not make him do anything, and did not say anything when he touched C.H., and C.H. did not say anything to him. C.H. said that was the only time anything happened with defendant. He said the first person he told about defendant touching his “weinee” was an officer. C.H. said that defendant never took any pictures or videos, and defendant never talked to him on the phone or the computer. C.H. also said that no one did anything with their mouth.
On cross-examination, C.H. testified that he told “one of a protectors” that defendant had him touch “his tickle spot, and he said, ‘Touch it.’” When asked what his tickle spot was, C.H. testified it was the middle pai't, which was the “weiner.” C.H. testified he did not remember saying defendant put his penis in his mouth Or that he put his penis in defendant’s mouth, and C.H. testified that he did not do that. C.H. testified he did not remember telling a police officer that defendant took his pants off. He said that he remembered telling the detective that his pants were not off when defendant touched him.
The second victim was M.B., who was six years old at the time of trial. A.T., M.B.’s mother, testified that she met defendant approximately 30 years earlier, when she was about 14 years old, and defendant had been a family friend.[5] A.T. testified that she introduced M.B. to defendant when M.B. was four years old. She testified that defendant never babysat M.B., but he would watch her for about ten minutes at a time. Defendant was at AT.’s house frequently and sometimes if |sshe was cleaning or doing laundry, defendant and M.B. would play video games together. A.T. testified that defendant asked to stay with her for two weeks. The morning after defendant’s first night staying with A.T., on April 14, 2013, M.B. started to act odd.[6] A.T. testified that she got up to use the bathroom around 3:30 а.m. and noticed that M.B. was still awake and she said that she could not sleep because she was scared.
M.B.’s father came back from work around 7:00 a.m. and A.T. pulled him into the kitchen and told him they had a problem because M.B. was telling her that someone had touched and hurt her, and she wouldn’t say who it was. M.B.’s father took M.B. into the bathtub and was talking to her when M.B. told him that “Uncle Clint” touched her, referring to defendant. M.B. said he touched her “tootie,” which was the word she was taught to use when being potty-trained. That morning, A.T. confronted defendant, crying, and asked if he touched her baby. Defendant said “[n]o” but did not look her in her face. A.T. testified that she “knew he was lying.”
That day, A.T. called 9-1-1 and deputies from the Jefferson Parish Sheriffs Office arrived at her home. M.B. was subsequently brought to the Jefferson Parish Children’s Advocacy Center. A.T. testified that after M.B. made the initial disclosure, M.B. had nose bleeds for three months, was vomiting, sick, and scared.
On cross-examination, A.T. testified that on the evening defendant stayed overnight, she had asked her husband to leave the home. A.T. testified that M.B. told her “Uncle Clint” touched her one time.
Detective Ronald Ray, with the Jefferson Parish Sheriffs Office’s Personal Violence Section, testified that on April 14, *1147 2013, he received a call about 13disclosure by a little girl over a sexual battery. On the scene, defendant was present along with the victim, the victim’s mother, and the responding unit deputy, Thelma Hill. Detective Ray testified that defendant denied ever touching the little girl at all, not even accidentally, which statement he later contradicted. Two days later, Detective Ray returned to the house with a female detective to speak with the child, and after that interview, there were never any other suspects other than defendant. Detective Ray testified that the victim was consistent with what happened and who had touched her.
On April 22, 2013, defendant elected to come to Detective Ray’s office and provide a statement. Detective Ray testified that there were some consistencies with what defendant said in his statement and what was learned from M.B. He also testified that the declarations of abuse from M.B. were consistent continuously.[7]
On cross-examination, Detective Ray testified that at some point, M.B.’s mother, A.T., relayed to him that if there was some type of touching, she believed “it was accidental.” He testified that A.T. also said that defendant and her daughter would play and she thought “it happened on occasion accidentally.” He testified that M.B. relayed to him that she was touched one time by defendant. Prior to Detective Ray suggesting to M.B.’s parents that it was a good idea for defendant to leave the home, the parents never requested that defendant leave the home.
Erika Dupepe, the executive director of the Jefferson Parish Children’s Advocacy Center, testified she would serve as a back-up forensic interviewer and did so on May 16, 2013 with M.B. Ms. Dupepe was able to refresh her memory by | inwatching the video of her interview with M.B. and she testified that M.B. said that she was touched five times and that M.B. said she was touched more than one time, on more than one day.
M.B. testified that she was six years old and in kindergarten. The video of M.B.’s forensic interview was published and viewed in open court. M.B. testified that everything she said in the video about where defendant touched her was the truth. M.B. also testified that she recognized defendant in the courtroom.
In the CAC video, M.B. was asked if anything was going on that she wanted to talk about. She said she did not want to talk about it because she was scared. When asked what she was scared of, M.B. said she was scared of “Clint” because he was a bad person. M.B. said that Clint hurt her. M.B. said that defendant touched her more than one time, on more than one day. When asked who Clint was, M.B. said he was a bad person and he was her mom’s friend. M.B. said that defendant touched her five times. M.B. said that she was on defendant’s lap when he touched her, and they were inside her house on the sofa. Her parents Were in a different room of the house when that happened. M.B. said that defendant did not say anything to her when he touched her and she did not say anything to him. M.B. said defendant touched her “tootie” and she pointed between her legs, to the front part.
*1148 On cross-examination, M.B. first testified that she did not remember her parents getting into an argument the night that she told her parents something happened with her and defendant. Then M.B. testified she did remember saying the reason she said defendant touched her was that she was mad at her mom for kicking her dad out of the house. M.B. testified she remembered saying that defendant touched her on more than one day. M.B. testified that when she said that, she was “[t]elling the truth.” M.B. testified that she did not remember telling Inthe male officer that defendant touched her by accident. M.B. testified that it would have been the “truth” if she told the officer that defendant touched her by accident.
Dr. Jamie Jackson, a child abuse pediatrician at the Audrey Hepburn Care Center at Children’s Hospital, was accepted by the court as an expert in the field of Child Abuse Pediatrics.[8] During her interview with M.B., the child said that defendant touched her on the “pee-pee area.” Dr. Jackson testified that on the physical examination, M.B. had some non-specific skin findings and a normal, variant intravaginal ridge.[9] Dr. Jackson testified that those findings were consistent with the allegations of a touching. She testified that M.B.’s disclosure was consistent with child sexual abuse. Dr. Jackson testified that an accidental touching could be a part of “grooming,” and that M.B.’s answers on cross-examination where she said defendant accidentally touched her could be consistent with a victim of sexual abuse who had been groomed.
In defendant’s case, Officer Thelma Hill with the Jefferson Parish Sheriffs Office testified that she responded to a call at 1616 Avenue A, in Marrero. Present were M.B., M.B.’s mother, M.B.’s father, and defendant. Officer Hill testified that M.B.’s mother, A.T., stated that M.B. advised her that someone touched her inappropriately. Officer Hill separated the mother and daughter and spoke to A.T. .Officer Hill testified that A.T. said M.B. told her that defendant touched M.B. inappropriately. Officer Hill testified that the mother was in disbelief and couldn’t believe that he would do something like that. Officer Hill remembered telling Detective Ray once he arrived on scene that “at some point, [M.B.] said, she made lathis incident up, because her mom kicked her dad out of the house,” and “the baby was mad.”
On cross-examination, Officer Hill testified that the “baby” was very evasive and she did not want to talk about the incident. Officer Hill testified that M.B. was trying to avoid talking about the incident and was trying to go to different rooms in the house.
Defendant testified in his own defense. He said that he had known C.H.’s family for approximately two years, through church and Facebook. Defendant said that he was waiting for an apartment to be ready, and because he did not have anywhere else to stay, he went to stay with A.L. for approximately two or three months. Once he moved in with A.L. in 2012, he would watch C.H. for a couple of hours while A.L. would go to work.
Defendant testified that in October of 2012, he was picking up a friend who want *1149 ed to get some food at the Piggly Wiggly, and defendant brought C.H. along. Defendant testified that his friend was shopping at Piggy Wiggly for thirty to forty-five minutes, while he stayed in the car with C.H. At some point, C.H. told defendant he needed to go to the bathroom, and defendant told C.H. to “just open the back door and go right there.” C.H. unbuttoned his own pants and unzipped to go to the bathroom, and defendant did not pull C.H.’s pants off. Defendant testified that C.H. zipped his own pants up, but he was having trouble buttoning them, and he asked defendant if he’d help him, so defendant did. Defendant testified that once he buttoned up C.H.’s pants, C.H. went back to playing around, playing games on the phone, and jumping from the back to the front of the car.
Defendant denied showing C.H. any form of anal sex, denied having C.H. touch his penis, denied ever touching C.H. on his anus, denied ever touching C.H. or having C.H. touch him on the genitals, and denied having C.H. touch him on hisj^anus. Defendant also denied that C.H. placed his penis in defendant’s mouth. On the day the police were called, C.H.’s mother, A.L., called and asked if he ever messed with C.H., and he told her no. He testified that he did not discourage her from calling the police.
Defendant testified that he knew M.B.’s family through her grandmother, and at some point, he became a guest in their home on a few occasions. He said that in April of 2013, he went to spend the night at A.T.’s house and that night A.T.’s boyfriend was asked to leave the house. Defendant was left alone with M.B. in the living room for a couple minutes at a time. Defendant testified that he was playing a game on his phone and M.B. was climbing on him. M.B. came running to greet him, she climbed up on him, and when she was going to sit down, she stepped on his testicles, and he grabbed her and moved her out of the way and when he was moving her, his hand touched her. Defendant testified he touched her vagina, and his hand barely brushed up against her for a second or two. He apologized to M.B. for touching her, but she just said, “[wjhat” and went to play on the phone. The incident took place approximately one month before the police were called. Defendant testified that the night before the police came, M.B.’s mother told him that there was an argument between her and her boyfriend. Defendant said that M.B.’s mother told him that her boyfriend had been drinking after she asked him not to, they got into an argument, and she told him to leave.
Defendant denied inappropriately touching M.B. on the genitals or anus. He denied ever intentionally touching M.B., but admitted to one accidental touching. He also admitted to a conviction for simple theft in the 1980s, and -a conviction for possession of cocaine in the early 1990s. Defendant testified that A.T. never asked him to leave her home, but rather the detective advised him to leave.
|14On cross-examination, defendant testified that he did not go into the store for C.H. to use the bathroom because on previous occasions, the store would not let him use the bathroom. Defendant testified that after C.H. finished using the bathroom, he got into the car through the backdoor and came in between the seats for defendant to help him button his pants. Defendant testified that he agreed with everything C.H. had said, both at trial and in the forensic interview, except for the part where C.H. said defendant touched his penis. He testified he never even accidentally touched C.H.’s penis.
When asked how he touched M.B.’s vagina, defendant testified that when he picked her up to move her, his hand *1150 touched her. Defendant testified that he believed M.B. was wearing underwear at the time. Defendant testified that he did not know why the two mothers would lie about him touching their children.

ASSIGNMENT OF ERROR NO. ONE

Sufficiency of the evidence

Defendant argues that the evidence was insufficient to support his convictions because C.H. possibly compensated for his father being physically abusive by blaming others or acting out, and C.H. had done so on previous occasions. Defendant argues that C.H. was found to be lying on several occasions, and that if he were inclined to molest a child, outside of the Piggly Wiggly was not the most opportune time. Defendant also argues that M.B.’s mother felt if there was an inappropriate touch, it was by accident. Furthermore, defendant contends that the children did not remember the alleged incidents involving defendant at the competency hearing, and for those reasons his convictions and sentences should be reversed.
The State argues that during trial, it did prove the elements of the crime, and the testimony of the victim alone can be sufficient to establish the elements of a | ^sexual offense. The State additionally argues that defendant gave several inconsistent versions of the incident involving M.B.
The appropriate standard of review for determining sufficiency of the evidence was established in Jackson v. Virginia, 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for appellate review is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. at 2789. See also State v. Mussall, 523 So.2d 1305 (La.1988); State v. Williams, 98-1146 (La.App. 5 Cir. 6/1/99), 738 So.2d 640, 648, writ denied, 99-1984 (La.1/7/00), 752 So.2d 176. Under the Jackson standard, a “review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.” Jackson, 443 U.S. at 319, 99 S.Ct. at 2789; State v. Le, 13-314 (La.App. 5 Cir. 12/12/13), 131 So.3d 306, 312; Williams, 738 So.2d at 648.
It is not the function of the appellate court to assess credibility or reweigh the evidence; rather, a reviewing court must consider the whole record, and determine whether a rational trier of fact would have' found guilt beyond a reasonable doubt. Williams, 738 So.2d at 648. See also State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291. When the trier of fact is faced with conflicting testimony, the weight of the testimony lies solely with the jury or judge, who may accept or reject, in whole or in part, the testimony of any witness. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833; State v. Bradley, 03-384 (La.App. 5 Cir. 9/16/03), 858 So.2d 80, 84, writ denied, 03-2745 (La.2/13/04), 867 So.2d 688.
In State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83, the Louisiana Supreme Court declared:
On appeal, the reviewing court “does not determine whether another possible hy-^ pothesis suggested by a defendant could afford an exculpatory explanation of the events.” ... Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
*1151 (Citations omitted; emphasis as found in the original). See also Williams, 904 So.2d at 833.
Defendant was convicted of sexual battery upon a known juvenile under the age of thirteen, a violation of La. R.S. 14:43.1. At the time of the offense, La. R.S. 14:43.1(A) pertinently defined sexual battery as follows, to-wit:
Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body .of the victim, when any of the following occur:
(1) where the offender acts without consent of the victim.
(2) The act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson, 02-1869 (La.4/14/04), 874 So.2d 66, 79, cert. denied; State v. Perkins, 11-162 (La.App. 5 Cir. 12/28/11), 83 So.3d 250, 255. With sexual offenses, the victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. Perkins, 83 So.3d at 255; State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066.
Upon review, for the following reasons, we find that the State presented sufficient evidence to support defendant’s convictions.
In Perkins, supra, the jury was provided with conflicting testimony offered by the defendant and various witnesses for the State. Id., 83 So.3d at 256. In that, case, the defendant testified that he did not touch the minor inappropriately, while the minor in her recorded statement described how the defendant had “rubbed the outside of her vagina on several occasions.” The jury chose to believe the statements from the victim and the State’s other witnesses. This Court found, viewing the evidence in a light most favorable to the State, the evidence was sufficient to convict the defendant of sexual battery upon a known juvenile. The victim had indicated the defendant “touched and rubbed her vagina with his hand” and such was sufficient to sustain a conviction for sexual battery.
In State v. Simon, 10-1111 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 320, writ denied, 11-1008 (La.11/4/11), 75 So.3d 922, the defendant raised issues of sufficiency of the evidence regarding his conviction of attempted sexual battery. During the trial, the State played the CAC interview of the six-year-old victim who described the events at issue. The victim also testified at trial and recounted those same events. The defendant contended that the child victim’s testimony was the only evidence offered, no witness could support her claim, and her conduct was inconsistent with her claim. The appellate court noted the testimony of the victim alone could be sufficient to establish the elements of a sexual offense, even without physical evidence. The jury heard all the testimony and found the child victim’s version of the events credible. The Third Circuit stated that her “credibility should not be second-guessed by this court.” Thus, the court found the evidence when |1sviewed in the *1152 light most favorable to the State, supported the guilty verdict rendered by the jury.
In State v. Johnson, 11-1213 (La.App. 4 Cir. 2/7/13), 109 So.3d 994, 998, writ denied, 13-554 (La.11/1/13), 124 So.3d 1106, the victim testified that the defendant touched her “personal area,” which was clarified to be her vagina. The defendant testified he did not assault the victim. The jury, as the trier of fact, chose to accept the victim’s testimony and the appellate court found the record contained sufficient evidence to support the defendant’s conviction and affirmed.
In the present case, as in the above-noted cases, the jury was presented with conflicting testimony. C.H. testified that what he said in the video about where defendant touched him was the truth, and defendant touched him “[i]n the middle.” C.H. also testified that defendant had him touch “his tickle spot,” which C.H. testified was the “middle part,” which was the “weiner.” The jury was also presented with some inconsistencies with C.H.’s account of what occurred. Detective Canas testified that C.H. said that another little boy learned that game about exposing his penis from defendant, but Detective Canas learned that the little boy did not know defendant. C.H. also at one point stated that defendant put his mouth on his “pee-pee,” but when Detective Canas attempted to clarify that statement, C.H. said, “No, no, no, like this.” Detective Canas also testified that C.H. provided different accounts of whether defendant’s pants were on or off. At trial, C.H. testified he did not remember saying defendant put his penis in his mouth, or that he put his penis in defendant’s mouth, and C.H. testified that he did not do that.
Similarly, the jury heard M.B. testify that everything she said in the video about where defendant touched her was the truth. M.B., who was six years old at the time of trial, testified that she recognized defendant in the courtroom. In the | ii¡CAC video, M.B. said defendant touched her “tootie” and she pointed between her legs, to the front part. The jury also heard some discrepancies with M.B.’s testimony, as she first testified that she did not remember her parents getting into an argument the night that she told her parents something happened with her and defendant. M.B. then testified she did remember saying the reason she said defendant touched her was that she was mad at her mom for kicking her dad out of the house. M.B. testified she remembered saying that defendant touched her on more than one day. M.B. testified that when she said that, she was telling the truth. M.B. testified that she did not remember telling the male officer that defendant touched her by accident. M.B. testified that it would have been the truth if she told the officer that defendant touched her by accident, and this answer conflicted with what she had previously said.
Detective Ray testified that defendant denied ever touching M.B. at all, not even accidentally, which statement defendant later contradicted in his investigation. Detective Ray testified that the victim was consistent with what happened and who had touched her. Detective Ray also testified that there were some consistencies with what defendant said in his statement and what was learned from M.B. Defendant in his statement and M.B. in her CAC interview both talked about being in a room in her house. M.B. said she was sitting on defendant’s lap, and defendant said she jumped up on his lap. The detective testified that the declarations of abuse from M.B. were consistent continuously.
Defendant also testified in his own defense. He denied the accusations and claimed he did not intentionally touch C.H. *1153 or M.B. in a sexually inappropriately way, as noted above.
In this case, presented with conflicting testimony and numerous theories by the defense, the jury chose to believe C.H. and M.B. and them parents, rather than 1 gndefendant. The jurors were provided testimony from both sides and accepted the victims’ testimonies, the victims’ parents’ testimonies, and the CAC interviews, as true. Thus, viewing the evidence in a light most favorable to the prosecution, the evidence presented was sufficient beyond a reasonable doubt to convict defendant of sexual battery upon known juveniles under the age of thirteen. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. TWO

Motion in limine
Defendant next argues that the trial court erred in granting the State’s motion in limine, which prevented him from introducing false allegations made by C.H. against Deacon Estrada regarding abuse. Defendant argues that the false allegations of abuse should have been admitted to attack C.H.’s veracity, and failure to do so was not harmless. Defendant relies on State v. Bryant, 12-591 (La.App. 5 Cir. 2/21/13), 110 So.3d 1191, 1198, writ denied, 13-648 (La.10/11/13), 123 So.3d 1218, where the court, in granting the State’s motion in limine, stated, “there was no evidence the victim’s prior allegations of improper sexual behavior were false.”
The State argues that the trial court properly granted the motion in limine, as defendant did not demonstrate that the allegations involving Deacon Estrada were sexual in nature or that the allegations were false.
At the hearing on the motion in limine, Deacon David Estrada testified that he was one of the ministry leaders at First Pentecostal Church, where he became familiar with defendant and both C.H. and M.B. Deacon Estrada testified that he was aware of a report that was generated a year ago where C.H. disclosed that they would “play-wrestle” at the church. Deacon Estrada testified that at some point, someone from the Jefferson Parish Sheriffs Office spoke with him. Deacon |2iEstrada testified that the detective he spoke to did not disclose what C.H. had said and that he was never arrested because of that conversation with the Sheriffs Office. Deacon Estrada testified that “play-wrestle” was just “horseplay” that was meant to “toughen” C.H. up. Deacon Estrada testified that he would hit him, but “not hit him hard, but just basically, ‘[h]ey, what’s up, [C.H.], how you doing?’ ” He testified that he was never alone with C.H. and there was always another adult present. Deacon Estrada testified that his interactions with C.H. were never of a sexual nature.
A.L., C.H.’s mother, testified that she brought C.H. to the Jefferson Parish Human Services Authority to be evaluated for autism, and while there, C.H. said that Deacon David Estrada hit him. She testified that C.H. did not make any sexual allegations about Deacon Estrada. She testified that she had known Deacon Estrada for about 11 or 12 years and never left him alone with C.H. She testified that she did see C.H. and Deacon Estrada “play-wrestle,” but did not see him touch C.H. inappropriately.
A.L. testified that C.H. had told Kristen Wolfe, a licensed clinical social worker at Jefferson Parish Human Services Authority that “he didn’t like the wrestling, the play-wrestling.” C.H. did not really specify where her son reported he was hit by Deacon Estrada. A.L. testified that she had previously dealt with Detective Canas concerning physical abuse between C.H. *1154 and his father. On cross-examination, A.L. testified that she did not consider the “play-wrestling” between C.H. and Deacon Estrada to be physical abuse. Wolfe testified that C.H. also talked about his mother’s friend’s son trying to touch him with his penis.
Allen Welch with the Jefferson Parish Sheriffs Office testified that he was dispatched for a complaint of possible child abuse. He testified that he did not find any evidence or allegations of sexual abuse, and C.H. did not make any state-mentsjjgthat David Estrada had sexually abused him. Officer Welch testified that the social worker, Ms. Wolfe, was the complainant and during a counseling session, C.H. stated to her that there might have been some horseplay, but nothing of sexual nature. She further testified that even though she felt it wasn’t alarming, it was her duty to report it to the police. Officer Welch recalled that C.H.’s mother did not express that the horseplay was inappropriate, and that it occurred at the church, and not in a secluded area. Officer Welch also testified that he believed the social worker told him the child did not make any sexual allegations.
The trial court granted the State’s motion in limine and stated that it was limited solely as to any alleged false sexual abuse allegations made against David Estrada. As such, the motion in limine was limited to the allegations against David Estrada and did not include allegations against defendant made by C.H.’s “little friend” that defendant refers to in brief.
Louisiana Code of Evidence article 412 prohibits evidence regarding the past sexual behavior of the victim in sexual assault cases, except: (1) when there is an issue of whether the accused was the source of semen or injury, and (2) when the past sexual behavior is with the accused and there is an issue of whether the. victim consented to the charged sexually assaultive behavior. Article 412 does not apply when a defendant attempts to use evidence of a victim’s false allegations of improper sexual behavior to impeach the victim’s credibility. State v. Smith, 98-2045 (La.9/8/99), 748 So.2d 199, 202-03. However, the admissibility of such evidence is still subject to all other standards for admissibility under La. C.E. arts. 403, 404, 607, 608, and 613. State v. Bolden, 03-0266 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1061-62; State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 587, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297.
| saThe relevant inquiry is whether reasonable jurors could find, based on the evidence presented by the defendant, that the victim had made prior false accusations. State v. Smith, 743 So.2d at 203. Assuming that burden has been met, all other standards for the admissibility of evidence apply. Id.; La. C.E. arts. 403, 404, 607, 608 and 613. The trial court’s determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Hernandez, 11-712 (La.App. 5 Cir. 4/10/12), 93 So.3d 615, 628, writ denied, 12-1142 (La.9/28/12), 98 So.3d 834.
In the present case, it was clarified at the hearing on the motion in limine that C.H. did not accuse Deacon Estrada of sexually abusing him. Thus, defendant did not provide evidence that C.H. made a false accusation of sexual assault against another individual. As a result, we find that the trial court did not err in granting the State’s motion in limine. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. THREE

Excessive sentences

In his final assignment, defendant argues that the sentences imposed by the *1155 trial court are unconstitutionally excessive because the trial judge “merely stated it reviewed the sentencing guidelines of [La. C.Cr.P.] art. 894.1 and felt that a lesser sentence would deprecate the seriousness of the offense.” Defendant argues that the trial judge gave no consideration to any factors listed in La.C.Cr.P. art. 894.1, including his health, his age, or the fact that he was in a wheelchair at the time of trial.
The State argues that defendant re-' ceived less than half of the maximum sentence that he could have received on each count, and that the trial judge advised defendant that he did consider the guidelines as set forth in La.C.Cr.P. art. 894.1.
I24TÍ1ÍS Court has held that failing to state the specific grounds upon which a motion to reconsider sentence is based limits a defendant to a bare review of the sentence for unconstitutional excessiveness. See, e.g., State v. Hill, 12-495 (La.App. 5 Cir. 12/18/12), 106 So.3d 1209, 1212. Here, the record shows that while defendant did file a written motion to reconsider sentence, he simply stated that the basis for his motion was that the sentences imposed upon him are excessive. Therefore, defendant has not preserved the issue of the trial' judge’s failure to comply with Article 894.1 for appeal. See State v. Lemon, 06-721 (La.App. 5 Cir. 1/30/07), 951 So.2d 1177, 1180. As such, defendant is entitled to a review of his sentences for unconstitutional excessiveness only.
Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution governs whether a sentence is unconstitutionally excessive, and therefore invalid. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Nguyen, 06-969 (La.App. 5 Cir. 4/24/07), 958 So.2d 61, 64, writ denied, 07-1161 (La.12/7/07), 969 So.2d 628; State v. Smith, 02-451 (La.App. 5 Cir. 1/14/03), 839 So.2d 165, 167. Furthermore, a sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Williams, 98-1146 (La.App. 5 Cir. 6/1/99), 738 So.2d 640, 655, writ denied, 99-1984 (La.1/7/00), 752 So.2d 176.
When imposing sentences, a trial judge has broad discretion in imposing a sentence within statutory limits, and a reviewing court may not set aside a sentence in absence of manifest error of discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330. [ 2sOn appeal, the issue is not whether a different sentence might have been more appropriate, but rather, whether the trial court abused its discretion. Williams, 03-3514 at 16, 893 So.2d at 17. See also State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130, writ denied, 08-1649 (La.4/17/09), 6 So.3d 786.
In 2012, at the time the offense was committed, La. R.S. 14:43.1(C)(2) provided that an individual convicted of sexual battery on a victim under the age of 13 years when the offender is 17 years of age or older, shall be punished by imprisonment at hard labor for not less than 25 years nor more than 99 years. Additionally, at least 25 years of the sentence is to be served without the benefit of parole, probation, or suspension of sentence. In the instant case, defendant received a sentence of 40 years on each count, to be served concurrently.
In State v. Wilmot, 13-994 (La.App. 5 Cir. 5/14/14), 142 So.3d 141, 148, the defen *1156 dant challenged his maximum sentence of 99 years for sexual battery of a known juvenile as excessive. This Court found that while there did not appear to be any Louisiana jurisprudence where a defendant received the maximum penalty for the above-mentioned offense, the trial court did not abuse its discretion in imposing said sentence. The victim was six years old when the abuse began and looked to the defendant as a father figure. Id. The trial judge considered letters from both the victim and the victim’s mother that described the life changes endured since the battery. The victim suffered from nightmares, sleeplessness, depression, anxiety, and loss of appetite after the battery. Given those circumstances, this Court could not find the trial court abused its discretion.
In State v. Redfearn, 44,709 (La.App. 2 Cir. 9/23/09), 22 So.3d 1078, 1087, writ denied, 31 So.3d 381, the defendant argued that his sentence of 40 years for his conviction of sexual battery and 30 years for his conviction of aggravated incest were excessive because he had no prior record, other than a DWI. Prior to [ ^sentencing, the trial court reviewed a presentence investigation, took into account the defendant’s social and personal history, considered his lack of remorse and violation of trust in the children, as well as considering mitigating factors such as the lack of criminal history. The court found that the offenses were so egregious that a severe sentence would not be excessive. The court found that the 40-year sentence imposed for sexual battery, while unquestionably harsh, was less than half the maximum sentence. The court further determined that the trial court adequately considered and articulated appropriate sentencing factors, and considering the heinous nature of the case, the sentences did not shock the sense of justice, and therefore, were not excessive.
Upon review, we find that defendant’s concurrent sentences of 40 years on each count are not unconstitutionally excessive. These sentences are less than half the maximum sentences that could have been imposed on defendant. This Court, in Wilmot, supra, found that a maximum sentence for similar conduct was not unconstitutionally excessive. Here, the trial court stated that it considered La.C.Cr.P. art. 894.1,[10] in addition to two victim impact statements presented prior to sentencing. In those statements, the victims’ families did not request the court to sentence defendant to the maximum sentence, but they did discuss how defendant’s actions had impacted their lives. Defendant was a family friend of both victims’ families and had stayed in both of the victims’ homes. Defendant had been left in a position of authority, as a baby-sitter or care-giver, in instances where the victims’ mothers were occupied. The judge also considered a statement made by defendant himself. The 40-year sentence per count is within the statutory ^guidelines, and given the discretion afforded the trial court, we find the sentences imposed on defendant are supported by the record and are not unconstitutionally excessive.

*1157
ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Wetland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent that require corrective action.

CONCLUSION

For the foregoing reasons, defendant’s convictions and sentences are affirmed.

AFFIRMED

. In accordance with La. R.S. 46:1844(3), the victims, who are minors, and their families *1144 will be referred to by their initials to protect the victims' identities.

. Asperger’s syndrome is an autism spectrum disorder (‘'ASD”) that is characterized by significant difficulties in social interaction and nonverbal communication, alongside restricted and repetitive patterns of behavior and interests.

. Subsequent to Dr. Wetsman’s interview with C.H., she learned he had been diagnosed with Asperger’s Syndrome.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. A.T. testified that she never had an intimate relationship with defendant.

. While the transcript reflects the date as April 14, 2012, the correct date is April 14, 2013.

. The audio recording of the statement was accepted into evidence as State’s Exhibit 7 and published in open court. The written transcription of the statement was also accepted into evidence as State's Exhibit 8. In his statement, defendant similarly describes how he accidentally touched M.B.’s vagina when she jumped in his lap and he moved her, as he does during his testimony at trial, infra. Defendant described that this accidental touching occurred three weeks to a month prior to his statement.

. On cross-examination, Dr. Jackson testified that she has testified a total of 46 times and only one time did she testify for the defense.

. Dr. Jackson testified that the normal variant intravaginal ridges found on M.B. are not uncommon, and M.B.’s history was consistent with having a normal exam, or a non-specific exam, and that she did not find anything out of the ordinary with it.

. While defendant argued that the trial court did not articulate the La.C.Cr.P art. 894.1 factors, prior to sentencing defendant to forty years on each count, the trial court judge did state, "the Court has considered the sentencing guidelines in Code of Criminal Procedure Article 894.1 It is additionally noted that, when there is an adequate factual basis for the sentence contained in the record, the trial court’s failure to articulate every circumstance listed in La.C.Cr.P. art. 894.1 does not require a remand for resentencing. State v. Sanders, 98-855 (La.App. 5 Cir. 5/19/99), 734 So.2d 1276, 1279, writ denied, 99-1980 (La.1/7/00), 752 So.2d 175.