384 So.2d 1000 (1980)
STATE of Louisiana In the Interest of Mark GALVAN.
No. 11154.
Court of Appeal of Louisiana, Fourth Circuit.
May 30, 1980.
Richard L. Ducote, Gretna, for defendant-appellee, Mark Galvan.
David J. Hebert, Marrero, for defendantappellee, Jesus Galvan.
Heisler, Wysocki & DeLaup, Frederick P. Heisler, New Orleans, for defendant-appellant, Rosalee Galvan.
Before SAMUEL, BOUTALL and BARRY, JJ.
BARRY, Judge.
This matter concerns whether Mark Galvan, a 14 year old male, is a child "in need of care" or "in need of supervision" under the provisions of the Code of Juvenile Procedure.
Mark's parents were married in 1964. They lived in Brownsville, Texas where Mark was born in 1965 and his sister in 1972. Mrs. Galvan has been deaf from birth and attended Chinchuba Institute for the Deaf in Marrero when she was a youngster. Shortly after Mark was born it was discovered that he had a hearing impairment and should attend Chinchuba for its specialized training. The family moved *1001 from Texas to Marrero and Mrs. Galvan's father, Dr. Vidal Longoria, provided funds to purchase the family home. In May, 1979, the Galvans separated and in conjunction with Mrs. Galvan's lawsuit for a legal separation a custody rule was tried in the 24th Judicial District Court on June 25, 1979.
The custody hearing was an adversary proceeding at which Mr. and Mrs. Galvan each sought custody of both children. After a full hearing the district judge awarded custody of Mark and his sister to Mrs. Galvan with the stipulation that she stay in Marrero until Mark finished school on July 20, 1979. After Mark finished summer school, Mrs. Galvan and her parents began preparations to move to Brownsville, Texas to establish a new domicile.
On July 21, 1979, Mr. Galvan had visitation rights with the children. During their visit, he had a private conversation with Mark after which both children returned to their mother in the evening. A short time later Mark had a disagreement with his sister and grandmother and left his home about 8:00 p. m. and ended up four hours later at a place of business supervised by his father. The father contacted the Office of Human Development, after which a social worker and Mr. Galvan returned the child to his home.
On July 25, 1979, when the Galvans were ready to move to Texas, Mr. Galvan went to Mrs. Galvan's home accompanied by a social worker and asked to speak to Mark in private. The private conversation lasted about one-half hour and Mr. Galvan left. A short time later Mark told his mother and grandparents that he hated them and his sister and that he was not going to Texas. That evening Mark again left his home and a few hours later went to a place of business supervised by his father. Mr. Galvan called another social worker who spoke to a detective (a friend of Mr. Galvan's) who happened to be at the same location as Mark and Mr. Galvan. Based upon the recommendation of the detective, the social worker called a juvenile judge who gave a verbal order which resulted in Mr. Galvan being granted temporary custody of Mark. A hearing was held in juvenile court on August 10, 1979, and a judgment was rendered giving custody of Mark to his father.
In his judgment the ad hoc Juvenile Judge gave three reasons why the juvenile court assumed jurisdiction. The first two were:
"1. The child was found to be without necessary supervision because his mother, then having custody, could not prevent his running away from home to be with his father. This placed the child in severe danger in that he is deaf and cannot hear traffic and other perils of the streets. This brings him within the definition at CJP 13(14)(c).
2. The child's emotional condition was substantially threatened as a result of cruel punishment and the allowing of the grandparents to do the same. Because of the child's special needs resulting from his handicap, and the separation of his parents and his strong attachment to his father, the threat of sending the child to a distant military school for normal behavior under the circumstance was, in this instance, cruel punishment. This brings him within the definition of CJP 13(14)(b).

* * * * * *
The court assumes jurisdiction, therefore, under CJP 15(c) [15(C)]."
The Code of Juvenile Procedure Art. 15 provides:
"Except as otherwise provided herein, a court exercising juvenile jurisdiction shall have exclusive original jurisdiction over the following proceedings:
(C). A proceeding in which a child is alleged to be in need of care."
Counsel for Mrs. Galvan urges in his brief that there is insufficient evidence to conclude that Mark is a child in need of care or supervision and therefore juvenile court did not have jurisdiction. Appellant stresses that this matter is basically a dispute over custody of Mark which had been adjudicated in the District Court only two months earlier.
*1002 The first reason given by the ad hoc judge to find Mark "a child in need of care" concerned the alleged lack of supervision by the mother in not preventing his leaving home alone with special emphasis placed on the judge's feeling that the child was in danger due to his hearing disability. CJP 13(14)(c) is the cited authority for this conclusion. Section 14(c) states:
(14) "`Child in need of care'" means a child:
(c) Who is without necessary food, clothing, shelter, medical care, education, or supervision because of abandonment by, or the disappearance or prolonged absence of, his parent, or because of any other reason."
We fail to see how the ad hoc judge's application of the facts herein apply to any part of 14(c). There is no evidence that Mark failed to receive food, clothing, shelter, medical care, education, or that Mrs. Galvan abandoned him or that Mrs. Galvan disappeared or was absent for a prolonged period. Perhaps the ad hoc judge used the "any other reason" provision of (c) as the basis to conclude that Mark's leaving home on two occasions to be with his father was justification to find that this 14 year old is "a child in need of care". We strongly disagree with this reason of the judgment.
The second reason in the judgment concerned a finding of "cruel punishment" under CJP 13(14)(b) which provides:
(14) "`Child in need of care'" means a child:
(b) Whose physical, mental or emotional condition is substantially threatened or impaired as a result of the refusal or neglect of his parent to supply the child with necessary food, clothing, shelter, medical care, counseling or education, or as a result of the parent's neglect or imposition of cruel punishment;"
The foundation for the ad hoc judge's determination of "cruel punishment" came about because of the "threats of sending the child to a distant military school". Somehow, the ad hoc judge reasons that a military school away from home would constitute "cruel punishment" considering that Mark has a 30% hearing impairment. We note in the record that Mark attended a regular high school and apparently functions quite well with a hearing aid. There is no evidence that Mark encountered unusual (or any) problems in his day-to-day school activities with other children. Disagreements between a teenager and a parent certainly are not uncommon and the "threat" to send the youngster to a military school is often intended to have a positive effect. We find absolutely no evidence of "cruel punishment" as enunciated in Section 14(b).
The third and last reason in the judgment states:
"The court also finds that the child is within the jurisdiction of the court as a `Child in Need of Supervision', without adjudicating him as such. The evidence clearly showed that on at least two occasions the child ran away from home without the consent of his mother, placing him within the definition at CJP 13(13)(b)." (Emphasis added).
The Code of Juvenile Procedure Art. 13(13)(b) provides:
(13) "`Child in need of supervision'" means a child who needs care or rehabilitation because:
(b) He habitually disobeys the reasonable and lawful demands of his parents, and is ungovernable and beyond their control."
The apparent intent of the ad hoc judge was to utilize the provisions of (c) in CJP 13(13) which states:
(c) "He absents himself from his home or usual place of abode without the consent of his parent;"
The language in this third reason is inappropriate. To state that a child "ran away from home" means that the child left his parent(s), or that the child left the area of his domicile and went to another locality, or that the child wanted to change his environment. On the two occasions when Mark left home he simply went to a place where he could be with his father. It appears he did so because he was leaving Marrero to *1003 move to Texas or because he may have thought that he would be sent to military school (even though there is no specific proof of this). We fail to see how Mrs. Galvan can spend every moment with each of her children which would be the only way to avoid the opportunity for either child to leave home. These two instances standing alone do not form a basis to conclude that Mark habitually disobeyed and is ungovernable by his mother under CJP 13(13)(b) or that he is a runaway child "in need of supervision" under CJP 13(13)(c).
Parents are certainly free to discipline their children when the need arises subject to proper discretion and within legal constraints. A 14 year old teenager leaving home unannounced on two occasions to be with his father (probably prompted to do so), and the admonition of attending military school as a method of discipline clearly fails to prove that Mark Galvan is " a child in need of care" and/or a "child in need of supervision".
This young man is fortunate to have two parents and grandparents who obviously love him very much and place him at the focal point of their personal concerns. There is uncontradicted testimony that the home of Mrs. Galvan is suitable for the needs of her family. The care and interest of maternal grandparents adds a greater foundation to Mark's security. We have searched this extensive record to rationalize the ad hoc judge's effort to remove custody from Mrs. Galvan. The only plausible explanation is Mark's testimony that he preferred to live with his father. This desire should certainly be considered, but, standing alone, it is not a compelling basis to change custody. If it was, then custody hearings would simply require testimony from the minor as to parental preference.
The record is totally void of reliable, direct evidence on which to base a conclusion that Mark Galvan is a neglected child under the provisions of the Code of Juvenile Procedure. To change custody would punish Mrs. Galvan when she did nothing wrong and there is no proof she did anything detrimental to her child. Mark should be returned to the legal custody of his mother as of the date of the rendition of this judgment pending it becoming final.
For the reasons assigned the decree of the Juvenile Court placing custody of the minor, Mark Galvan, in the custody of Jesus Galvan, is reversed and set aside. It is now ordered that the said minor be returned to the custody of his mother, Mrs. Rosalee L. Galvan, immediately upon the rendition of this judgment, it being the intent of this Court that Mrs. Galvan retain custody of the minor pending the finality of these proceedings.
REVERSED.
SAMUEL, J., concurs with written reasons.
SAMUEL, Judge, concurring.
I agree with the facts found in the majority opinion and with the majority decree. However, under the facts of this case, I am of the opinion the juvenile court was without jurisdiction following a factual determination. Jurisdiction over the custody of Mark Galvan remained solely in the district court.
I respectfully concur.