Judge Daniel L. Dysart
This is an appeal of a trial court judgment granting an Order of Protection ("Order"), effective through March 19, 2019, issued to protect two minor children, J.B. and D.B.,[1] from acts of abuse by their mother, appellant, S.L.B. For the reasons that follow, we find no abuse of the trial court's discretion in issuing the Order and we affirm that ruling.
FACTUAL AND PROCEDURAL BACKGROUND
This protracted and contentious family matter commenced with the filing, on October 31, 2013, of a Petition for Divorce Pursuant to Louisiana Civil Code Article 102 ("Divorce Petition") by S.L.B.[2] According to the Divorce Petition, appellant, S.L.B., and appellee, C.E.B., were married on September 3, 2000 and established their matrimonial domicile in Orleans Parish. D.E.B. subsequently moved to Mobile, Alabama, for a medical residency program. J.B. and D.B. were born during the marriage. At the time of the Divorce Petition's filing, the children were ages eight and ten, respectively.
Over the ensuing several years, various pleadings were filed and hearings held in the matter, resulting in trial court rulings not pertinent to this appeal.
In 2016 and by consent of the parties, the case was consolidated with two cases pending in other divisions and filed subsequent to the instant suit. The first of these suits, filed in 2015 and entitled "State of Louisiana, et al. v. [C.E.B.].," sought to establish C.E.B.'s child support obligations and to require C.E.B. to maintain health insurance for the children. The second suit, filed in 2016 and entitled "[S.L.B.] v. [C.E.B.]," was a divorce proceeding (with incidental matters) based on the parties'
*955 living separate and apart pursuant to La. C.C. art. 103.1.
Other than the consolidation of the cases in 2016, nothing of record took place in the cases between September 8, 2014, and March 2, 2017, when C.E.B. filed a Petition for Protection From Abuse ("Petition"). A temporary restraining order ("TRO") was issued in connection with the Petition, effective through March 16, 2017, the date on which a hearing was set. C.E.B. then filed, on March 7, 2017, a motion to terminate child support on the basis that custody of the children should remain with C.E.B. and therefore, there would be "no further need or requirement for child support."
In open court on March 16, 2017, the parties agreed to continue the hearing on the Petition and the TRO was extended. The hearing was continued on several other occasions by consent of the parties and ultimately took place on September 7 and 19, 2017. At the conclusion of the hearing, the trial court found that C.E.B. "has met his burden of proof by a preponderance of the evidence that [J.B.] was physically abused by his mother ... and that the abuse occurred in the presence of [D.B.]." The trial court placed both children in the temporary custody of C.E.B. subject to supervised visitation with S.L.B. The court also ordered S.L.B. to attend anger management and parenting classes. The trial court denied the request for attorney's fees and ordered the parties to bear their own respective costs.
The written Order, memorializing the trial court's oral judgment, was then issued on September 19, 2017, finding that S.L.B. "represents a credible threat to the physical safety of a family member" and issuing an injunction (an Order of Protection in the form of a "P.O./Preliminary or Permanent Injunction"), effective until March 19, 2019. The trial court also issued a judgment assessing costs against S.L.B. in the amount of $258.00.[3]
S.L.B. has devolutively appealed the September 19, 2017 Order.[4]
DISCUSSION
This case arises under the Domestic Abuse Assistance Act, La. R.S. 46:2131, et seq. (sometimes hereafter referred to as "the Act"), a law enacted for the purpose of "provid[ing] relief to victims of domestic violence by establishing a civil remedy for domestic violence that affords the victim(s) immediate and easily accessible protection." Dvilansky v. Correu , 16-0279, p. 6 (La. App. 4 Cir. 10/26/16), 204 So.3d 686, 689, writ denied , 16-2081 (La. 1/9/17), 214 So.3d 871, citing Alfonso v. Cooper , 14-0145, p. 13 (La. App. 4 Cir. 7/16/14), 146 So.3d 796, 805.
Under the Act, a parent "may seek relief on behalf of any minor child ... by filing a petition with the court alleging abuse by the defendant." La. R.S. 46:2133 D. The court may then "grant any protective order ... to bring about a cessation of domestic abuse as defined in R.S. 46:2132, or the threat or danger thereof, to ... any minor children." La. R.S. 46:2136 A. Domestic abuse, as incorporated within this statute, " includes but is not limited to physical or sexual abuse and any offense *956 against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family member, household member, or dating partner against another ...." La. R.S. 46:2132 (4).
We note that, as pertains to a TRO, the statute indicates that "[u]pon good cause shown in an ex parte proceeding, the court may enter a temporary restraining order, without bond, as it deems necessary to protect from abuse ... any minor children ...." La R.S. 46: 2135 A. Our jurisprudence has interpreted the "good cause shown" requirement to apply to both TROs and to other protective orders. See Dvilansky , 16-0279, p. 6, 204 So.3d at 689 (" La. R.S. 46:2135 and 46:2136 require that there be 'good cause shown' for the issuance of a protective order."); See also D.M.S. , 14-0364, p. 15, 225 So.3d at 1137.
The Act specifically indicates that "[a]ny person who shows immediate and present danger of abuse shall constitute good cause." La. R.S. 46:2135 A; See also Dvilansky , 16-0279, p. 6, 204 So.3d at 689 ; D.M.S. , 14-0364, p. 15, 225 So.3d at 1137. La. R.S. 46:2135 A also indicates that "[t]he court shall consider any and all past history of abuse, or threats thereof, in determining the existence of an immediate and present danger of abuse. There is no requirement that the abuse itself be recent, immediate, or present."
In the instant matter, the trial court found that C.E.B. "met his burden of proof by a preponderance of the evidence that [J.B.] was physically abused by his mother, S.L.B., and that the abuse occurred in the presence of the minor child, [D.B.]" On that basis, the trial court "placed both children in the temporary care and custody of C.E.B. subject to supervised visitation with the mother at the Harmony House program and Kingsley House every other Saturday for a period for two to four hours depending on the availability of the Center."
Standard of Review
The abuse of discretion standard of review by an appellate court of a trial court domestic protective order is clear. As this Court indicated in Rodriguez v. Claassen , 16-0610, pp. 3-4 (La. App. 4 Cir. 12/21/16), 207 So.3d 490, 493, quoting D.M.S. , 14-0364, p. 16, 225 So.3d at 1138 :
An appellate court reviews domestic protective orders for abuse of discretion. Alfonso v. Cooper , 14-0145, p. 13 (La. App. 4 Cir. 7/16/14), 146 So.3d 796, 805.
Moreover, the standard of review applicable to fact findings of the trial court has been clearly enunciated by our Supreme Court in Rabalais v. Nash , 06-0999, p. 4 (La. 3/9/07), 952 So.2d 653, 657 :
It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong .... To reverse a fact-finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill , 505 So.2d 1120, 1127 (La. 1987). Where the [fact-finder's] findings are reasonable, in light of the record reviewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court's ruling is manifestly erroneous, or clearly wrong.
With this standard of review in mind, we now address S.L.B.'s assignments of error.
*957 Reasonable discipline
In her first assignment of error, S.L.B. maintains that the trial court erred in granting the Petition and issuing the Order.[5] While S.L.B. concedes that an altercation took place on February 20, 2017, she contends that the discipline she administered was "reasonable and was within the ambit of C.C. art. 228." She argues that "[p]arents under Louisiana law may administer corporal punishment" and that "Louisiana law permits corporal punishment when used in a reasonable manner for disciplinary reasons."
Under the recently enacted article 228 of the Louisiana Civil Code, which became effective on January 1, 2016:
A child shall obey his parents in all matters not contrary to law or good morals. Parents have the right and obligation to correct and discipline the child in a reasonable manner.[6]
The Revised Official Comments (a) and (b), respectively note that a "child's obligation of obedience serves as the foundation for the parental right of correction," while the article "bestows upon parents the right to correct their child in a reasonable manner." There are no cases interpreting this article or defining what is considered to be a reasonable manner of discipline.[7] However, it is clear that the right of correction in a "reasonable manner" does not include what are the grounds for a protective order under the Act - "domestic abuse" which is defined, in part, as "physical ... abuse ... committed by one family member ... against another." La. R.S. 46:2132 (4). We, therefore, look to the Act for guidance as to what constitutes "physical abuse."
There are few cases under the Act addressing the issue of domestic abuse by a parent of a child. In Vital v. Francois , 12-1279 (La. App. 3 Cir. 5/1/13), 2013 WL 1846626, for example, the court found no error in the trial court's issuance of a protective order based on the limited record before it. Noting that the trial court's judgment was based on evidence that the father had "whipp[ed] [the child] several times with a belt which caused her to fall to the floor and caused bruises on her leg" and had "grabb[ed] [the child] by her neck, throwing her to the ground, and continuing to whip her," the court found that the discipline was not reasonable but was "something beyond discipline and more in the nature of excessive [and] abusive," which was "beyond the bounds of what the law would expect a parent to do to a child during the disciplinary action." Id. , at *2.
*958 S.L.B. cites the case of Mason v. Hadnot , 08-2015, p. 9 (La. App. 1 Cir. 2/13/09), 6 So.3d 256, which involved motions for contempt in a child custody dispute. While the case did not address the Act specifically (and the issue did not concern domestic abuse allegations), the court, "mindful that corporal punishment, when reasonable in degree, used by a parent of a minor child for disciplinary reasons is permitted in Louisiana," found that the father's admission to striking a child "10 to 15 times with a belt ... did not constitute reasonable discipline so as to be considered corporal punishment." Id. , pp. 9-10, 6 So.3d at 261.
S.L.B. also cites State in Interest of BS v. PS , 542 So.2d 1163, 1166 (La. App. 2 Cir. 1989) for the position that a mother's making a "linear mark on her four (4) year old daughter's face," as a "single occurrence of corporal punishment ... was insufficient to prove a child is in need of care." Our review of this case reflects that the court was focused on whether the child was in need of custody by the State. Whether the mark on the child's face was caused by the mother was not definitive and the court's finding was based on a concession that the mark was, in fact, caused by the mother.
Similarly, S.L.B. relies on Griffith v. Latiolais , 10-0754 (La. 10/19/10), 48 So.3d 1058, a child custody case, again for the principle that "[i]n Louisiana, a parent is permitted to use corporal punishment to discipline a child provided it is done in a reasonable manner." Id. , p. 21, 48 So.3d at 1072. In Griffith , the mother admitted to spanking the child with a wooden spoon on a few occasions, but had been counseled on using "time outs" and agreed to do so; there were no further instances thereafter. Thus, the Court found that "it was unnecessary for the trial court to prohibit corporal punishment in this case" and commented that "if any party uses corporal punishment in an unreasonable manner, that issue will have to be addressed at that time." Id. The Court made no express finding as to whether the use of a wooden spoon to spank the child was unreasonable.
Other cases decided under the Act are also instructive. In McCann v. McCann , 09-1341 (La. App. 3 Cir. 3/10/10), 33 So.3d 389, 394, during an altercation between separated spouses, the husband grabbed keys from the wife, who demanded them back. He then slung his arm at her, causing a cut on her arm by the keys, which was identified by a photograph showing "her right arm with a deep scratch and bruise." Id. , p. 3, 33 So.3d at 392. Affirming the trial court's issuance of a protective order under the Act, the Third Circuit found that "[the] act of striking [the wife] on the arm with her keys amounted to domestic abuse." Id. , p. 7, 33 So.3d at 395.
In Paschal v. Hazlinsky , 35,513 (La. App. 2 Cir. 12/19/01), 803 So.2d 413, the court found no error in the granting of a protective order from abuse where the testimony was that, during an altercation with her daughters, a mother was hit in the chest which resulted in a large bruise. The court found that there was no abuse of discretion by the hearing officer who "weighed the credibility of the witnesses and concluded that the evidence showed that the daughters had caused the bruise on Eva's chest (of which there was photographic evidence) and that they had physically restrained her at some point during the dispute." Id. , p. 9. 803 So.2d at 419.
S.L.B. concedes that an altercation occurred between her and J.B. on February 20, 2017. She argues, however, that, when J.B. argued with her about who should have to clean the dishes, she started taking away points from him which escalated the *959 situation.[8] J.B. then used profane language towards her, after which she "swatted [him] in the mouth with the tip of her fingers" and she "inadvertently hit his nose causing it to bleed." She contends that J.B. then "balled up his fists and ... perceiv[ing] that he was going to attack her ... she plac[ed] him on the ground with her on top of him." When he "continued to curse and scream" at her, and "said that he was going to kill her," she "tapped him on the mouth" with each use of "the 'f' word."
On cross-examination, S.L.B. was questioned further about the manner by which she struck J.B., as evidenced by the following colloquy:
Q. According to El Charrita Craig, of DCFS, you admitted hitting him in the mouth. Is that what you told El Charrita Craig?
A. I sure did.
Q. Okay. So, you didn't swat him in the mouth, you hit him in the mouth.
A. And so, by hitting and swatting, help me understand the difference between the two.
Q. I'll leave that to the Court to decide. When you hit him, so you hit him in the mouth but it caused a nosebleed.
A. Yes.
Citing Articles 223, 226 and 228, S.L.B. contends that the disciplinary measures she used were not only appropriate, but also that under Article 228, there was an "obligation to correct and discipline" J.B. because he used "totally inappropriate language towards her and ... she feared that he might take aggressive actions against her." (Emphasis supplied). She also points to other testimony in the record from C.E.B. and Rochelle Gauthier, a counselor at J.B.'s school, that J.B. has a history of behavioral issues.[9]
S.L.B. argues that the nature of J.B.'s nose bleed "was minor and transitory." In support, she notes that, when C.E.B. brought J.B. to the emergency room on February 22, 2017, there were no signs of physical injury. He likewise, had no sign of injury when he was examined by Dr. Jamie Jackson on February 24, 2017.[10]
In Dr. Jackson's examination, J.B. related that he and his mother argued about having to do the dishes and that she "swung at [him] and hit [him], causing [his] nose to bleed." She then threw him on the ground and "climbed on top of [him]" where he "couldn't move." J.B.'s statement is consistent with the testimony of S.L.B. that she struck him; he indicated:
...whenever I did something she didn't like then she would just go to town on [him]. So like if she - - if I said a curse word - - then she's [sic] hit me. If I tried to roll over and crawl away, she'd roll back over and hit me. If I did anything she didn't like, she would hit me, And so I had a bused [sic] lip, so my mouth was bleeding and my nose was bleeding from almost every time she hit me, for two or *960 three times. It took a couple of swings to make me start bleeding.
At the conclusion of trial, the trial judge stated that "this case does not demonstrate reasonable corporal punishment as outlined in the statute by a parent." She then concluded that it had been proven "by a preponderance of the evidence that J.B. was physically abused by his mother."
Mindful of our standard of review, we cannot say that the trial court abused its discretion in issuing the Order and in finding that there was domestic abuse (i.e. , physical abuse) under the circumstances of this case. The trial court obviously weighed the conflicting testimony of the witnesses in making its ruling and we do not find that the record demonstrates the lack of a reasonable basis for the trial court's finding, warranting a reversal of the trial court's determination.
We further note that "[t]he reviewing court must always keep in mind that if a trier of fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently." Sam Staub Enterprises, Inc. v. Chapital , 11-1050, p. 11 (La. App. 4 Cir. 3/14/12), 88 So.3d 690, 697, citing Orleans Sheet Metal Works & Roofing, Inc. v. Rabito , 04-0359, pp. 3-4 (La. App. 4 Cir. 8/17/05), 916 So.2d 1143, 1146. This is in keeping with our well-settled jurisprudence that "the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." Sassone v. Doe , 11-1821, p. 4 (La. App. 4 Cir. 5/23/12), 96 So.3d 1243, 1246, quoting Rosell v. ESCO , 549 So.2d 840, 844-845 (La.1989).
We find no merit to this assignment of error.
Due process
In her next assignment of error, S.L.B. maintains that she was denied due process because neither J.B. nor D.B. testified and she was unable to cross-examine them. She invokes the "uncalled witness" rule[11] and argues that the failure to call them as witnesses "gives rise to the presumption that the witnesses' testimony would be unfavorable." She maintains that, even C.E.B. admitted that their testimony at the hearing was "essential."
According to S.L.B., when she noticed the boys' deposition testimony, C.E.B. filed a motion to quash and requested a " Watermeier " hearing.[12] While she contends that such a hearing was not necessary because the boys "were of sufficient age," she nevertheless maintains that she was deprived of due process because "there was no mechanism for her to question the children."
A review of the record reflects that C.E.B. moved for a Watermeier hearing on March 7, 2017, more than three weeks before S.L.B. filed notices for the depositions *961 of J.B. and D.B. on March 31, 2017. The motion for the Watermeier hearing was set for March 16, 2017, also before the notice of depositions. C.E.B. then moved, without opposition, to reset the hearing on his motion for a Watermeier hearing to May 9, 2017, the date on which the original hearing on the Petition for Protection from Abuse had been set. Thereafter, on April 24, 2017, C.E.B. filed a Motion to Quash the depositions of the children.[13] All matters were continued to August 2, 2017, due to the illness of counsel for S.L.B.; the TRO in place was extended through that date.
On August 2, 2017, the trial court issued another Order, containing written comments indicating that the "[p]arties consent to continue and reset Petition for Protection from Abuse and Motion for [ Watermeier ] hearing and Motion to Quash/Protective Order, et al[.] all set for May 9, 2017 to the new date of August 2, 2017 at 9:00 a.m." The matter was again reset, by consent of the parties, for September 7, 2017, due to counsel for S.L.B.'s recent surgery. The TRO was again kept in effect until September 7, 2017.
In the interim, S.L.B. filed a memorandum in opposition to the Watermeier interview on August 31, 2017. In it, she argued that she should be allowed "to cross examine the ... boys in open court," which in this case, was "particularly essential ... because of the severe remedies provided in a Protective Order case." She further argued that "due process and fundamental fairness entitle[d] her to effectively present her defense including the right to hear and or [sic] to cross-examine witnesses.
When the matter proceeded on September 7, 2017, other than a discussion of whether witnesses would be sequestered, no other preliminary matters were considered before the first witness, Dr. Jackson, testified. On the second day of trial, September 19, 2017, near the end of trial, counsel for S.L.B. brought the issue of the Watermeier hearing and motion to quash to the trial court's attention, asking the court to "address those issues." Counsel for C.E.B. then interjected that, "when [he] filed to reset [the] Watermeier hearing, [he] requested that the Court defer the decision on the Watermeier hearing until the end of this hearing" and he asked that the "decision not be ruled upon at this point in time and wait until the end of Counsel's case." The trial judge responded "[o]kay" and trial resumed. Two remaining witnesses testified (S.L.B. and Ms. Gauthier), followed by counsels' closing arguments and the trial court's ruling. The issue of the Watermeier hearing or the motion to quash were neither brought up again nor ruled upon.
S.L.B. does not contend that the trial court erred in failing to conduct a Watermeier hearing. Such an argument would be contrary to the position she has taken throughout this litigation; namely, that J.B. and D.B were of sufficient age that they could testify at the trial and a Watermeier hearing was unnecessary.[14] Instead, *962 the argument she made in opposing the motion for a Watermeier hearing, was that "[w]hen a judge interviews a child without the consent of the domiciliary parent[,] it deprives him or her to [sic] the right to hear crucial evidence and be given an opportunity to explain or to rebut statements made by the child[ren]."
S.L.B.'s argument focuses on the fact that she did not depose J.B. or D.B. and that neither were called as witnesses at the hearing; thus, she argues that her due process rights were violated because she had no opportunity to cross-examine them. She relies heavily on the case of Fuge v. Uiterwyk , 94-1815 (La. App. 4 Cir. 3/29/95), 653 So.2d 707. Fuge was a child custody case in which the trial court refused "to allow the parties access to the psychiatrist's report," upon which the trial court relied in its decision to order visitation between two teenage boys and their father in Florida. Id. , p. 6, 653 So.2d at 712. This Court found that "[w]ithout the opportunity to review the report, and to cross-examine the psychiatrist, Ms. Fuge and the children were denied fundamental due process." Id. This Court also found reversible error in sequestering the parents when the children testified, indicating:
Ms. Fuge's right to due process was denied as well by the trial judge's sequestration of the parents during the boys' testimony. While the trial judge enjoys a broad discretion in the conduct of custody proceedings, particularly when the children are of a tender age, this discretion is not absolute. In Watermeier v. Watermeier , 462 So.2d 1272, 1275 (La. App. 5th Cir.1985), writ denied, 464 So.2d 301 (La.1985), the sequestration of parents was held to be an appropriate compromise of conflicting interests where the witness was a six year old, whose very competency to testify was at issue. The Watermeier sequestration order, by its own terms, is neither ordained nor mandatory. The Uiterwyk boys, honor students at Jesuit High School in New Orleans, and declared by the trial judge to be "bright and capable young men," had no need for protection from the mere presence of their parents to balance against Ms. Fuge's due process rights, and her exclusion from the proceedings requires reversal of the judgment below.
Id.
The instant matter is distinguishable from Fuge in many respects. There is no issue in this case concerning the trial court's refusing to allow S.L.B. access to medical records and, in particular, the records of Dr. Jackson and Dr. Jackson's March 3, 2017 report. Nothing in the record indicates that the medical records were not provided to S.L.B. In fact, the medical records submitted into evidence at the hearing were all attached to the motion for the Watermeier hearing, which had been filed into the record in March, 2017, some six months prior to the September hearing. Accordingly, S.L.B. had access to *963 all of the medical records well before the hearing.
Likewise, unlike the Fuge case, here, the trial court did not refuse to allow counsel for S.L.B. to cross-examine Dr. Jackson. The record clearly reflects that Dr. Jackson was cross-examined.
There is a lack of jurisprudence on the issue of whether a child must testify in a hearing under the Domestic Abuse Assistance Act. Neither the Act, nor cases arising from the Act, specify that a victim must testify at a hearing on a protective order. To the contrary, the Act only specifies that a protective order be issued when "[r]easonable notice and opportunity to be heard is given to the person against whom the order is sought sufficient to protect that person's right to due process." La. R.S. 46:2136 B(2) (or if the parties enter into a consent agreement). In this case, there can be no question that the parties had reasonable notice of hearing (the Petition was filed in March and the hearing took place in September) and an opportunity to be heard.
We note, too, that the record reflects that notices of the depositions of J.B. and D.B. were filed into the record on March 31, 2017, setting the depositions for April 24, 2017. On April 24, 2017, C.E.B. filed a motion to quash those depositions (along with other motions). The motion to quash was never heard. However, no other efforts were made in the six months between the notice of depositions and the hearing on the Petition to secure those depositions.
Similarly, there is nothing in the record indicating that S.L.B. issued subpoenas to J.B. or D.B. for the September, 2017 hearing or moved to require their presence at the hearing. By analogy to a criminal matter, our Constitution provides that "[a]n accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf." La. Const. Art. 1, Section 16. That right encompasses the "right to demand subpoenas for witnesses and the right to have those subpoenas served." State v. Arabie , 07-806 (La. App. 5 Cir. 3/11/08), 982 So.2d 136, 141.
Here, there is no evidence that J.B. or D.B. were subpoenaed for the September, 2017 hearing or that any other measures were taken to ensure their appearance for the hearing. Likewise, they were never called as witnesses by S.L.B. Nor was there an objection made that they were not brought to court by C.E.B. In sum, S.L.B. failed to properly preserve this issue for review.
We find no merit in S.L.B.'s argument that her due process rights were violated in this case.
Testimony of Dr. Jackson and audiotaped interview
In her next assignment of error, S.L.B. contends that the trial court erred in allowing Dr. Jackson to testify and in allowing into evidence an audiotaped recording of an interview she conducted with J.B. four days after the February 20, 2017 altercation. She argues that Dr. Jackson's testimony was hearsay for which there are no exceptions. She further argues that the audiotape recording is hearsay as well.
In support of her arguments, S.L.B. cites the Louisiana Supreme Court case of C.M.J. v. L.M.C. , 14-1119, p. 1 (La. 10/15/14), 156 So.3d 16, 17, "a highly contested custody dispute over three minor children" and in which allegations were made that the father had sexually abused his young daughter. The trial court refused to allow the minor children to testify, on the basis that their testimony was contaminated by their mother's manipulation and the Supreme Court agreed with the trial court that there was "abundant support *964 in the record to support the conclusion that the mother fabricated the sexual abuse allegations." Id. , p. 21, 156 So.3d at 30.
S.L.B. quotes a statement from the C.M.J. case which indicates that the court, in attributing "no weight" to the findings of a nurse who initially examined the daughter at the hospital, along with her mother, before referring them to the DCFS, found that "[t]here was not even a cursory objective investigation or inquiry that would lead a reliable result in reaching any conclusion about whether or not these children had been abused ...." Id , p. 13, 156 So.3d at 26. She urges this Court to use this language to discredit Dr. Jackson's testimony. Notably, this quotation is not a finding by the Supreme Court, but rather, a quotation from the trial court's findings of fact.
One of the issues in the case focused on the trial court's refusal to allow the children to testify. Instead, the trial court allowed a court-appointed expert in clinical psychology, Dr. Pellegrin, to testify. Finding no error on the part of the trial court in its decision to not allow the children to testify, the Court stated:
The trial court had the advantage of Dr. Pellegrin's extensive report which summarized every interview with every party and witness, including the children. In comparing the proffered testimony of the children to that summarized by Dr. Pellegrin in her report, we cannot say the trial court failed to benefit from any testimony the children would have provided. Instead, what was before the trial court in the form of Dr. Pellegrin's summary of the children's interviews is remarkably similar to what was proffered.
Id. p. 31, 156 So.3d at 31.
S.L.B. argues that, because Dr. Jackson testified that she is not a "forensic interviewer," she observed "no evidence of physical abuse," and her interview "failed to follow any recognized standards and protocol for making a determination of physical abuse," this Court should follow the C.M.J. case and attribute "no weight to her opinion."
The C.M.J. case does not stand for the principle that a "forensic evaluation" must be made in order to determine whether abuse occurred (or in the C.M.J. case, case, whether sexual abuse occurred).[15] To the contrary, the Court found that the issue of whether abuse occurred "is a factual finding that belongs within the province of the trial court's decision-making function." Id. The Court further stated:
Expert witnesses are intended to "assist the trier of fact" in understanding the evidence or in the determination of a fact in issue. La.Code Evid. art. 702. Without question, the opinion of an expert may be given great weight by a trial court in its determination of the psychological well-being of a child or parent. However, this does not mean that the expert has usurped the authority of the trial court in determining the key issue of "best interest of the child." As we stated in our discussion of the exclusion of the children's testimony, this decision is based on all the evidence and testimony presented to the fact-finder. It is well settled in Louisiana that the trial court is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other *965 evidence. Green v. K-Mart Corp. , 03-2495, p. 5 (La. 5/25/04), 874 So.2d 838, 843. A trial court may accept or reject in whole or in part the opinion expressed by an expert. Id. Further, a trial judge may substitute his/her own common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.
Id. Of course, the C.M.J. case concerned a custody dispute; however, the Court's discussion regarding expert witness testimony is equally applicable here.
In the instant matter, Dr. Jackson, a board certified pediatrician (who was then two months away from taking the board exams for child abuse pediatrics), was employed by the Audrey Hepburn Care Center at Children's Hospital as an attending physician in child abuse pediatrics. She had previously testified and had been accepted as an expert in that capacity in more than sixty cases.[16] Contrary to S.L.B.'s contention, Dr. Jackson testified that she implements a procedure when a child presents to Children's Hospital:
During our visit we do - we get a basic medical history from the parent or caregiver who is present and then we do a private talking child [sic] with the child which is audio recorded if the child's able or verbal or able to give us a history. Then after that I would do a physical exam and then I would complete a report.
Dr. Jackson agreed that the record and audio interview are reasonably pertinent to the medical treatment and diagnosis of patients.
S.L.B. contends that Dr. Jackson's diagnosis of physical abuse was impermissible hearsay, particularly given that J.B. had "no evidence of physical abuse" and because the only treatment she prescribed at the time she saw him was eczema patches. While Dr. Jackson did not find any physical signs of abuse, she testified that she saw him four days after the incident and the "types of injuries [J.B. sustained] can resolve very quickly." She explained that "[t]he tissue inside the nose and inside the mouth, those are espousal tissues so they can heal really quickly and really well."
Dr. Jackson's ultimate conclusion, based on her interview with J.B. and the photographs she saw, and as she noted in the report she created, was of "child physical abuse." There is no question that S.L.B. struck J.B. (although the nature of the strike is disputed) in such a manner as to cause his nose to bleed given that she admitted it at the hearing. She likewise admitted to having "restrained" J.B. by sitting on him.
As the Supreme Court found in C.M.J. , in the instant case, we find no abuse of discretion in the trial court's finding that S.L.B.'s actions against J.B. constituted "physical abuse" within the meaning of the Act. To the extent that that finding was based, in part, on Dr. Jackson's opinion, we likewise find no abuse of discretion, given that, as the C.M.J. Court noted, "the trial court is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence" and the trial court may substitute its own judgment where warranted. Id. p. 31, 156 So.3d at 31.
Nor do we find any error in the trial court's allowing the audio recorded interview into evidence. S.L.B., without citing *966 any case law in support of her contention, maintains that it is impermissible hearsay. We disagree.
First, Dr. Jackson authenticated the recording by testifying that she personally made the recording. Only she and J.B. were present in the room when the recording was made. According to Dr. Jackson, the recording "is part of the medical record" and audio recordings are always made as standard procedure at the Audrey Hepburn Care Center. There is no indication in the record that the recording is not accurate, nor that the recording is in any way unreliable.
While most cases involving audio recordings arise in the context of criminal cases and criminal sexual assault cases, we find those cases to be instructive. In State v. Luckey , 16-494 (La. App. 5 Cir. 2/8/17), 212 So.3d 1220, 1232, writ denied , 17-0432 (La. 10/27/17), 228 So.3d 1225, and writ denied , 17-0617 (La. 10/27/17), 228 So.3d 1234, for example, one of the issues concerned an audiotape recording made by Dr. Jackson at the Audrey Hepburn Care Center of a child who was the victim of a sexual assault (which had been redacted to remove discussions of a prior sexual assault). The Court noted:
The Louisiana Supreme Court has considered several factors, derived from United States v. Starks , 515 F.2d 112 (3d Cir. 1975), when determining whether a party has established a foundation for the admissibility of an audio recording. See State v. Hennigan , 404 So.2d 222, 236 n.7 (La. 1981). Although the Supreme Court has never held that the establishment of each of these facts is necessary for the admission of audio recordings, we consider the following factors helpful in reviewing whether the State properly laid a foundation for the admissibility of the redacted audio recording of Dr. Jackson's interview with E.D.:
(1) That the recording device was capable of taking the conversation now offered in evidence.
(2) That the operator of the device was competent to operate the device.
(3) That the recording is authentic and correct.
(4) That changes, additions or deletions have not been made in the recording.
(5) That the recording had been preserved in a manner that is shown to the court.
(6) That the speakers are identified.
(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.
Id. , p. 17, 212 So.3d at 1232-33 (emphasis supplied). There, the Court found no error in the trial court's admission of the audiotaped interview over defense counsel's objection. It noted that the recording "accurately reflected the conversation she had with E.D.," that "during E.D.'s interview, she and E.D. were the only individuals in the room" and that "the conversation was voluntary and in good faith." Id. , p. 17, 212 So.3d at 1233.
Second, although this is not a child custody case, our jurisprudence indicates that, with respect to child custody cases, there is "a relaxed evidentiary standard ... used to advance the purposes of the custody proceeding" because "the Louisiana legislature has concluded that the best interests of children are not served by strict application of the rules of evidence." Bowden v. Brown , 48,268, p. 17 (La. App. 2 Cir. 5/15/13), 114 So.3d 1194, 1205. We see no reason why this principle is not applicable to this matter.
We also find the case of State v. Koederitz , 14-1526 (La. 3/17/15), 166 So.3d 981, to be instructive. There, the Louisiana Supreme *967 Court examined the admissibility of medical records of a woman who reported domestic abuse by her boyfriend, but who did not want to notify the police, and who had subsequently committed suicide. The medical records contained the diagnostic impression of "victim of domestic violence." Id. , 14-1526, p. 2, 166 So.3d at 983. The defendant argued that the records were impermissible hearsay.
Rejecting that argument, the Supreme Court found:
... the statements made in the present case by the victim to her treating physicians identifying the person who struck her repeatedly in the face and broke her nose, as recorded in the certified records from Ochsner Hospital, are admissible under the hearsay exception in La. C.E. art. 803(4), and as a matter of the Confrontation Clause, because they were made for the non-testimonial purposes of, and were reasonably pertinent to, medical treatment, and diagnosis in connection with medical treatment, in a case that appeared to be one of domestic violence and that involved not only treatment of the victim's physical injuries but also psychiatric counseling.
Id. , p. 4, 166 So.3d at 984. In so holding, the Court cited United States v. Joe , 8 F.3d 1488, 1494-95 (10th Cir.1993), which indicated that although a statement identifying the person responsible for a person's injuries is ordinarily not admissible, "[t]he identity of the abuser is reasonably pertinent to treatment in virtually every domestic sexual assault case, even those not involving children .... The physician generally must know who the abuser was in order to render proper treatment because the physician ... may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere." Id. , pp. 5-6, 166 So.3d at 985.
The Koederitz Court explained:
... we see no principled basis for confining statements of fault under La.C.E. art. 803(4) solely to cases involving domestic sexual assault, whether of adults or children, as opposed to other instances of physical assault and abuse taking place in a context that may be fairly described in terms of domestic violence. See, e.g., Moore v. City of Leeds , 1 So.3d 145, 150 (Ala.Crim.App.2008) (rationale for admitting statements of identity by a minor receiving treatment for sexual abuse "would also apply to victims of domestic violence."); State v. Williams , 137 Wash.App. 736, 154 P.3d 322, 328 (2007) ("Generally, statements of fault are inadmissible, but much, of course, depends on the context in which such statement are made. In domestic violence and sexual abuse situations, a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under [Evidence Rule] 803(a)(4) because part of reasonable treatment and therapy is to prevent recurrence and future injury.") (internal quotation marks and citations omitted); Oldman v. State , 998 P.2d 957, 961-62 (Wyo.2000) ("Identity rarely is germane to the promotion of treatment or diagnosis, but we, as well as other courts, have recognized that such statements can be relevant to treatment in instances of child abuse.... There is no logical reason for not applying this rationale to non-sexual, traumatic abuse within a family or household, since sexual abuse is simply a particular kind of physical abuse.") (citations omitted).
Id. pp. 6-7, 166 So.3d at 985.
The Court concluded that the statements are "non-hearsay as a matter of La.C.Cr.P. art. 803(4) and are therefore *968 admissible as substantive evidence because they were made for purposes of diagnosis and treatment, essential components under current medical practice in cases of domestic violence, and not as part of a forensic examination intended for use at trial." Id. , p. 8, 166 So.3d at 986. See also G.N.S. v. S.B.S , 35,348, p. 20 (La. App. 2 Cir. 9/28/01), 796 So.2d 739, 750, a child custody case in which the mother was alleged to have abused the child, where the court found statements the child made to health care professionals to be admissible; the trial court rejected the mother's contention that the statements were inadmissible hearsay and further rejected the arguments that there was "no indicia of reliability as to [the] statements, the child never testified at trial [,] the court never sought to determine the competency of the child" and that "no valid forensic interview of the child was conducted."
Thus, as the Court found in Luckey , we find no abuse of the trial court's discretion in admitting the recorded interview into evidence at the hearing. A proper foundation was laid for its admission and there is no showing that the recording is inaccurate.
Dr. Pellegrin's custody evaluation
Next, S.L.B. argues that the trial court erred in failing to admit into evidence the evaluation conducted by a court-appointed psychologist, Dr. Pellegrin.[17] She contends that, although Dr. Pellegrin's report was written in 2015, it is nonetheless pertinent regarding the claims of a "long-standing history of abuse" and to assist the trial court "in understanding the dynamics, personality and characteristics of J.B., which was a paramount issue in the instant action." In the alternative, she contends that the trial court should have ordered an updated evaluation by Dr. Pellegrin.
At the outset, we note that "a trial court's rulings on such evidentiary issues will not be disturbed unless a clear abuse of discretion is shown." In re C.A.C. , 17-0108, p. 10 (La. App. 4 Cir. 11/2/17), 231 So.3d 58, 66. See also , Yokum v. Funky 544 Rhythm & Blues Cafe , 16-1142 (La. App. 4 Cir. 5/23/18), 248 So.3d 723, 743, 2018 WL 2328375 at *28, quoting Pattison v. Valley Forge Ins. Co. , 599 So.2d 873, 877 (La. App. 4 Cir. 1992) ("[w]hether evidence is relevant is within the discretion of the trial judge....").
Under Code of Evidence article 402, "[a]ll relevant evidence is admissible ...." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.C. E. art. 401.
The only issue at the September hearing was whether an act of "domestic abuse" within the meaning of the Domestic Abuse Assistance Act occurred on February 20, 2017. A psychologist's report from a 2014 evaluation has no bearing as to whether, on February 20, 2017, S.L.B.'s actions towards her son amounted to "domestic abuse." While S.L.B. sought, through Dr. Pellegrin's 2014 report, to educate the trial court as to the "dynamics, personality and characteristics of J.B.," it is apparent that this was meant to demonstrate J.B.'s history of behavioral issues.[18] The record clearly *969 evidences that the trial court was made aware of J.B.'s behavioral issues.
Because we find that a 2014 report is not relevant to the issues before the trial court in September, 2017, we find no error in the trial court's ruling the report inadmissible.
Admissibility of photographs
In her final assignment of error, S.L.B. contends that the trial court improperly admitted photographs at the September hearing. Her argument is two-fold. First, without citing any case law supporting her argument, she contends that the photographs were not properly authenticated. Second, she argues, again without any supporting case law, that even if the photographs were properly before the trial court, the probative value of the photographs is outweighed by their prejudicial effects.
Louisiana Code of Evidence article 901 A provides "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Subpart B of Article 901, "[b]y way of illustration only, and not by way of limitation" sets forth "examples of authentication or identification conforming with the requirements of this Article" which include the "[t]estimony of witness with knowledge," which is "[t]estimony that a matter is what it is claimed to be." La. C.E. art. 901 B(1).
Our jurisprudence interpreting this article is well-settled. This Court recently reiterated the rules for the admissibility of photographs as follows:
... a photograph need not be identified by the person who took it to be admissible. The proper foundation for the admission of a photograph into evidence is laid when a witness having personal knowledge of the subject depicted by the photograph identifies it as such. State v. LeBlanc , 10-1484, p. 22 (La. App. 4 Cir. 9/30/11), 76 So.3d 572, 586. Determining the proper use of photographs at trial is generally within the sound discretion of the trial judge. State v. Kelly , 362 So.2d 1071, 1077 (La. 1978) ; State v. Allen , 00-0346, pp. 20-21 (La. App. 4 Cir. 10/17/01), 800 So.2d 378, 390.
State v. Doucette , 17-0501, pp. 18-19 (La. App. 4 Cir. 5/23/18), 243 So.3d 704, 705. See also , Rudd v. Atlas Processing Refinery , 26,048 (La. App. 2 Cir. 9/21/94), 644 So.2d 402, 410.
In Reynolds v. Bordelon , 14-2371 (La. 6/30/15), 172 So.3d 607, for example, the Louisiana Supreme Court found no error in the trial court's refusal to allow a plaintiff to offer post-accident photographs of a vehicle in support of his motion for summary judgment. Citing article 901, the Court found that "the plaintiff did not introduce an affidavit or testimony by any person familiar with the photographs, the photographer or otherwise, in order to lay the foundation that the photographs were actually depictions of the plaintiff's vehicle or that the depictions were accurate." Id. , p. 4, 172 So.3d at 611.
The instant matter is clearly distinguishable. While D.B., who took the photographs with his cell phone, did not testify, testimony about the photographs was elicited from C.E.B. with great detail. C.E.B. first testified that the photographs were located on the cell phone he personally gave his son, D.B., and that the copies of the photographs produced at the hearing are "identical to the pictures on the phone." C.E.B. then identified many things depicted in the photographs, of which he has personal knowledge: his son; S.L.B. sitting on top of J.B.; the pajama pants S.L.B. was wearing in the photographs; the rug (which was in his and S.L.B.'s *970 former living room); a gold frame; artwork; and the tabletop on which the gold frame was positioned.
S.L.B. was evasive when shown the photographs. When asked if they depicted her sitting on top of her son, she repeatedly replied "I couldn't tell you, sir." She was then asked if the pajama pants worn by the woman in the picture were hers, to which she replied, "I am sure that there were many people who bought pajamas that are purple with little lambs on them." When pressed further about those pajama pants, she testified, "I couldn't tell you whether those are my pajamas." When asked about whether it was her hand in the photograph, she answered, "[i]t looks like a hand" but she "couldn't tell" if it was hers. And, when she was asked if the child in the photograph was her son, she replied, "[i]t appears to be a child" but she couldn't "tell for sure." S.L.B. was also less than forthright when it came to other depictions in the photographs (e.g., her legs, her hands, the table).
It cannot seriously be disputed that C.E.B. is not "a witness having personal knowledge of the subject depicted by the photograph [who] identifies it as such." Nor can it seriously be contested that C.E.B. is not a "person familiar with the photographs [and] the photographer." We therefore find that a proper foundation was laid for the admission of the photographs as there is no question as to their authenticity.
We now turn to the issue of whether the probative value of the photographs is outweighed by their prejudicial effect. Our jurisprudence on this issue is equally well settled.
Louisiana Code of Evidence article 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." When the issue of the admissibility of evidence is reviewed on appeal, we defer to the trial court, as the "trial court is vested with much discretion in determining whether the probative value of evidence is substantially outweighed by its prejudicial effect." Williams , 17-0544, pp. 18-19, 240 So.3d at 365-66, quoting State v. Washington , 99-1111, p. 13 (La. App. 4 Cir. 3/21/01), 788 So.2d 477, 490. With respect to photographic evidence, in Williams , this Court reiterated the settled rule that "[p]hotographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible." Id. ,p. 19, 240 So.3d at 366, quoting State v. Coleman , 14-0402, p. 32 (La. 2/26/16), 188 So.3d 174, 201, cert. denied , --- U.S. ----, 137 S.Ct. 153, 196 L.Ed. 2d 116 (2016).
The vast majority of cases in which the issue of the admissibility of photographs arise are criminal matters. However, the same rules apply to civil matters and the determination of whether photographs may be admitted is decided on a case by case basis. See, e.g., Novosyolova v. Stephens , 02-0711, p. 19 (La. App. 4 Cir. 6/11/03), 850 So.2d 29, 39, quoting Fryson v. Dupre Transport, Inc. , 00-0858, p. 4 (La. App. 4 Cir. 8/29/01), 798 So.2d 1012, 1016 ("[t]he admissibility of a videotape is determined on a case-by-case basis depending on the individual facts and circumstances of each case."). In Hunt v. Long , 33,395 (La. App. 2 Cir. 6/21/00), 763 So.2d 811, 819, for example, the court found no error in the admission of photographs of a "demolished" vehicle even where liability was not at issue. The Court found "no prejudice which could have outweighed the probative value of the photo or otherwise adversely *971 affected any substantial right of the defendants even if the photo were deemed irrelevant because of the stipulation to liability." Id. , p. 12, 763 So.2d at 819.
Similarly, in Smith v. Juneau , 95-0724, p. 30 (La. App. 4 Cir. 4/9/97), 692 So.2d 1365, this Court found no error in the trial court's admission of photographs taken of the plaintiff who had been severely injured in a car accident, and who developed severe bedsores (which required thirteen surgeries over a ten month period) during his hospitalization. The defendant argued that the photographs had an "inflammatory nature," a contention rejected by the Court, which found that "[t]he photographs admitted into evidence depict plaintiff's injuries at various stages of development" and "[w]hile some of the photographs are unpleasant, they are not necessarily inflammatory." Id. , p. 30, 692 So.2d at 1380. Notably, the Court rejected the argument that the photographs were not authenticated because a doctor was able to identify the plaintiff in them.
In Lougon v. Era Aviation, Inc. , 609 So.2d 330, 344 (La. App. 3 Cir. 1992), the court found no error in the admission of photographs of the plaintiff in an operating room which depicted facial lacerations sustained in an accident, as well as photographs of the entry wounds from an arthroscopic surgery, nor others of facial lacerations. The Court found no abuse of the trial court's discretion in admitting the photographs: "[t]he photographs have probative value in showing the jury the extent and severity of certain facial lacerations, as well as the devices and procedures used to diagnose, stabilize, or correct [the plaintiff's] injuries. We do not find the photographs inflammatory or prejudicial." Id. at 344. See also G.N.S. v. S.B.S , 35,348 (La. App. 2 Cir. 9/28/01), 796 So.2d 739, 741, a child custody case, where the Court allowed a photograph showing injuries to a child into evidence which was first disclosed after trial had begun; the Court found that because the photograph was disclosed immediately after it was found, the defendant "was then allowed to call witnesses to rebut the plaintiff's contention that the photo reflected the child's injuries on June 14, 1999" and therefore, "[a]ny prejudice that the defendant might have suffered was thus remedied." Id. , p. 23, 796 So.2d at 752 ; See also Alvarez v. Se. Commercial Cleaning, LLC , 13-657 (La. App. 5 Cir. 2/26/14), 136 So.3d 329, 336 (videotape of an accident held admissible insofar as it "aids the trial court's understanding of the facts.").
In the instant matter, S.L.B. was aware of the photographs at issue no later than March 2, 2017, as they were attached to the Petition for Protection From Abuse (and were also attached to other pleadings in the record). There can be no dispute that S.L.B. was not surprised by the photographs at the hearing. Furthermore, it is disingenuous for S.L.B. to argue that the photos are inflammatory while at the same time arguing that the corporal punishment she administered was reasonable.
We find, as the Court did in Smith , that the photographs are not particularly inflammatory. While the photographs are certainly unfavorable to S.L.B., as this Court found in Williams , there can be no question that they illustrate the facts of this case, shed light upon those facts, and are relevant in depicting what transpired on February 20, 2017.
We further note that this matter was heard by a judge and not a jury and accordingly, there is little chance of actual prejudice. See , e.g. , Wakefield v. Reliance Nat. Indemn. Co. , 02-1173, p. 10 (La. App. 5 Cir. 4/29/03), 845 So.2d 1238, 1245 (as concerns the admission of a videotape, the Court commented: "it is important to note *972 that this was a bench trial, not a jury trial. The likelihood of prejudice is much less under these circumstances.").
We thus find no abuse of the trial court's discretion in allowing the photographs into evidence at the hearing.
CONCLUSION
For the reasons set forth more fully herein, we find no abuse of the trial court's discretion in issuing the Order of Protection and we, accordingly, affirm the trial court's judgment.
AFFIRMED

As is our practice and as is set forth in Rule 5-2 of the Uniform Rules of Court for the Courts of Appeal, we use the initials of the minor children for confidentiality purposes. See also D.M.S. v. I.D.S., 14-0364, p. 1 n.3 (La. App. 4 Cir. 3/4/15), 225 So.3d 1127, 1130, writ denied , 15-0897 (La. 6/19/15), 172 So.3d 654 ("[b]ecause of the sensitive nature presented by the facts of this case and in order to protect the identity of the minors involved, we have chosen to use the initials of the parties ... in lieu of their names, although their names appear in the sealed record.").

While numerous events took place in the course of this litigation, we set forth only those facts pertinent to this appeal.

C.E.B.'s motion for the termination of child support was denied on September 22, 2017, on the basis that the motion must be set for a contradictory hearing.

We note that the appellate brief of C.E.B. fails to comply with Rule 2-12.2 D(2) of the Local Rules of Court for the Courts of Appeal which requires that briefs be "Roman or Times New Roman 14 point or larger computer font." However, because the brief is only 13 pages in length (and the Local Rule 2-12.2 D(1) permits 31 pages), it does not appear that D.E.B.'s use of a smaller font was intended to circumvent the page limitation.

We discuss this assignment of error along with her assignment of error number six, insofar as they are largely the same argument. In the sixth assignment of error, S.L.B. argues that "there was insufficient evidence to grant a protective order" because "corporal punishment is permissible" and because "a parent has an obligation under C.C. art. 228 to administer reasonable discipline." (Emphasis supplied).

Similarly, La. C.C. art. 223 provides that "[p]arental authority includes rights and obligations of physical care, supervision, protection, discipline, and instruction of the child" and La. C.C. art. 226 provides that "[p]arents have a moral obligation to provide moral, social, and material direction for their child."

Our jurisprudence prior to the enactment of this statute has, however, recognized that "[p]arents are certainly free to discipline their children when the need arises subject to proper discretion and within legal constraints." State in Interest of Galvan , 384 So.2d 1000, 1003 (La. App. 4 Cir. 1980). See also , Merritt v. Merritt , 550 So.2d 882, 891 (La. App. 2 Cir. 1989) ("[a] mother has a duty and responsibility to teach and discipline the children and this often requires actions that are unpleasant for the children"). Both of these cases arose in the context of child custody (the Galvan case focusing on whether the child was "in need of care").

S.L.B. testified that she implements a system whereby she awards points to her children for performing chores, assignments and acts of good behavior; J.B. was accumulating points towards the full use of an iPhone. Points were also deducted for bad behavior, poor reports from school, and the like.

Ms. Gauthier testified that J.B. has had issues at school, including fighting and making lewd comments to a female student.

Dr. Jackson, a board certified pediatrician, has testified as an expert in child abuse pediatrics in more than sixty separate cases in three states and had previously been accepted by the trial judge in this case in the same capacity. The trial judge accepted Dr. Jackson as an expert in child abuse pediatrics.

"The 'uncalled witness' rule has been defined as an adverse presumption that arises when 'a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence' and fails to call such witnesses." Taylor v. Entergy Corp. , 01-0805, p. 14 (La. App. 4 Cir. 4/17/02), 816 So.2d 933, 941.

"A 'Watermeier hearing' is a hearing in chambers, outside the presence of the parents, but in the presence of their attorneys, with a record of the hearing to be made by the court reporter, to inquire as to the competency of a child to testify as to custody." In re D.C.M. , 13-0085, p. 6 n.9 (La. App. 1 Cir. 6/11/13), 170 So.3d 165, 168, writ denied , 13-1669 (La. 7/17/13), 118 So.3d 1102.

The motion also sought a protective order prohibiting the children's depositions, a request for an in camera viewing of the DCFS (Department of Children and Family Services) report. In the alternative, the motion sought to "continue/defer the hearing on the motion to quash pending full petition for protection from abuse set for May 9, 2017."

We note that Watermeier hearings are typically conducted in the context of child custody disputes. Indeed, in Watermeier , the "issue was whether, during a custody hearing and over the objection of counsel for one of the parties, the trial court could conduct an unrecorded, in-chambers interview of the minor children." Sorrells v. Sorrells , 15-500, p. 9 (La. App. 3 Cir. 11/4/15), 178 So.3d 288, 294. The Watermeier hearing is a jurisprudential rule and there is no legal right to a Watermeier hearing. See Toups v. Toups , 14-960, p. 2 (La. App. 3 Cir. 3/4/15), 2015 WL 904014 ("Watermeier does not require that the trial court interview all children in custody matters"); see also, Judge Tobias' dissent in In re Benson , 15-0874 (La. App. 4 Cir. 2/24/16), 216 So.3d 950, 962, writ denied sub nom. In re Interdiction of Benson , 16-0314 (La. 4/8/16), 188 So.3d 1052 (Tobias, J., dissenting: "[t]he 'Watermeier hearing' that the trial court held where the trial court examined Mr. Benson is not authorized by law and I dare say that it has not been jurisprudentially recognized. My appreciation of the purpose a 'Watermeier hearing' is to ascertain whether a child of tender years is capable of testifying truthfully and whether the child should be subjected to cross-examination by counsel for the parties on the issue of custody.")(Emphasis supplied; footnote omitted).

The vast majority of cases for which forensic evaluations are conducted are sexual abuse cases for which forensic evaluations are necessarily crucial. It is unclear, in this case, how Dr. Jackson's interview in this case would have differed from a "forensic interview" and S.L.B. makes no showing that the interview was otherwise inadequate.

See , e.g. , State v. Williams , 17-0544 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 361 ; State v. Hampton , 13-0580, p. 7 (La. App. 4 Cir. 2/19/14), 136 So.3d 240, 245 ; State v. Porter , 13-0357 (La. App. 4 Cir. 10/8/14), 151 So.3d 871, 880, writ denied , 14-2353 (La. 9/11/15), 176 So.3d 1037 ; State v. Brenckle , 14-883 (La. App. 5 Cir. 5/14/15), 170 So.3d 1141, 1148.

After the trial court sustained an objection as to the relevance of the report at the hearing, S.L.B. proffered the report. The report was issued in connection with a 2014 proceeding, years prior the events giving rise to this matter.

See footnote 9. We also note that there was testimony in the record as to J.B.'s having been hospitalized for psychiatric issues in the past.