# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**19-166**

**DAVID MICHAEL CRAIG**

**VERSUS**

**SHARI BISHOP**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2018-3536,
HONORABLE LILYNN CUTRER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**VAN H. KYZAR**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Shannon J. Gremillion, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Hillary L. Nixon**
**Law Office of Hillary L. Nixon, L.L.C.**
**1111 Ryan Street**
**Lake Charles, LA 70601**
**(337) 419-5252**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Shari Bishop**

**David Hudson**
**Larry A. Roach, Inc.**
**2917 Ryan Street**
**Lake Charles, LA 70601**
**(337) 433-8504**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **David Michael Craig**

**KYZAR, Judge.**

The defendant, Shari Bishop, appeals from the trial court judgment granting a protective order in favor of the plaintiff, David Michael Craig. For the following reasons, we affirm.

## DISCUSSION OF THE RECORD

This matter is a companion case to *Jerry Israel Cummings v. Shari Bishop*, 19-168 (La.App. 3 Cir. 10/23/19), _ So.3d _, which was rendered by this court this same day.

The parties, David Michael Craig and Shari Bishop, were married in Calcasieu Parish on July 4, 2015. The parties are the parents of one child, D.M.C.,[1] who was born on November 7, 2011, during Shari's prior marriage to Jerry Israel Cummings.[2] On September 13, 2017, David filed a petition for divorce, in which he sought an ex parte custody order, child support, and various temporary restraining orders (TROs). Sole provisional custody of D.M.C. was granted to David by an ex parte custody order, rendered on September 17, 2017, as well as TROs enjoining Shari from removing or attempting to remove D.M.C. from Calcasieu Parish or from hiding or secreting D.M.C. in any way and enjoining her from discussing the matter with D.M.C., disparaging David, or attempting to alienate D.M.C. from David in any way.

On September 28, 2017, Shari reconvened, seeking a divorce from David. Following an October 30, 2017 hearing, the trial court rendered a stipulated judgment on November 21, 2017, whereby Shari was awarded supervised visitation

---

[1] The initials of all minor children are used to protect their identities. Uniform Rules—Courts of Appeal, Rule 5-2.

[2] Although Jerry filed a petition to disavow paternity of D.M.C. on November 22, 2011, the record in those proceedings does not reveal whether he was successful. However, the trial court, in its July 13, 2018 written reasons for judgment, noted in a footnote that "it appears that David was recognized as the biological father" of D.M.C. in the divorce proceedings between Jerry and Shari.

with D.M.C., to be supervised at all times by Ronnie and Ronda Bishop, Shari's parents. On January 5, 2018, Shari filed an application for an emergency ex parte custody order based on "several worrisome statements" she alleges were made by D.M.C. "about certain things that he has seen, heard, and experienced in the presence of [David], and/or his parents that involve killing, death, abuse, and neglect[.] On January 10, 2018, David filed a first supplemental and amending petition, adding Jerry as an additional necessary party to the suit.

On February 22, 2018, David filed a rule for contempt, alleging that instead of returning D.M.C. to him as scheduled on December 24, 2017, Shari and Mr. Bishop fled with him to Texas on December 23, 2017, in contravention of the prior issued TRO. D.M.C. was eventually taken into law enforcement custody on December 25, 2017, and then returned to David's custody.

Following a multi-day trial on the merits on the custody and contempt issues, the trial court rendered written reasons for judgment on July 13, 2018, finding that it was in the best interest of D.M.C. that David be awarded sole custody. The trial court further held that Shari failed to prove her claims:

> [T]hat Jerry, David and/or any other person (i.e. Danny Meyers, demons, devil worshippers, juggalos, etc.) have abused [D.M.C.] or Jerry's three children who testified at trial. The only thing that could be considered abuse is the actions that Shari has taken with these children by filling their heads with bizarre and untrue claims and fears and rewarding them when they repeat them to others.

The trial court ordered that all visitation between Shari and D.M.C. take place at the Whistle Stop, a supervised visitation location. The trial court further found Shari in contempt of court as a result of her actions in taking D.M.C. to Texas and her failure to timely pay child support. It also found Mr. Bishop in contempt of court based on his intentional violation of his supervision duties relative to Shari's supervised visitation with D.M.C. The trial court sentenced Shari to ninety days in the parish

jail and Mr. Bishop to thirty days in the parish jail, with the sentences suspended as long as both parties complied with all future court orders. A written judgment was rendered by the trial court on July 13, 2018. An appeal by Shari from this judgment is the subject of a separate appeal before this court.[3] At the time that the record was lodged in the present appeal, the divorce proceedings between David and Shari were still pending.

On August 23, 2018, David filed a petition seeking protection from abuse, which is the subject matter of this appeal. In his petition, filed on his and D.M.C.'s behalf, David alleged that Shari had abused him and D.M.C. by stalking them, threatening them with bodily harm, threatening their lives, and attempting to have them killed. He alleged that the following abuse by Shari on July 23, 2018:

> [A]ttempt to have David Craig murdered by a third party. On this date, [E.F.C.] (daughter of Shari Bishop and Jerry Cummings) saw Shari at the L'Auberge Casino with a man she did not know. [E.F.C.] was introduced to this man by Shari as a friend, and [E.F.C.] was told by Shari and by this man that Shari was going to have this man and his friends kill David and Jerry as revenge for prior incidents of abuse, including incidents of ritual satanic abuse, which Shari has repeatedly alleged were committed by David and Jerry. [E.F.C.] has repeatedly denied such abuse ever occurred, and she denied it again on that date. She was told that the man and his friends were ready and willing to kill David and Jerry. A criminal investigation is ongoing regarding this solicitation of murder by Shari against both David and Jerry.

David further alleged past incidents of abuse by Shari against him, as follows:

> On multiple occasions in recent months, following the custody trial between David Craig and Shari Bishop, Shari has attempted to have David murdered by multiple third parties. [E.F.C.] has spoken on multiple occasions with Shari and with a former boyfriend of Shari named Joshua Martin, and they have both spoken to [E.F.C.] about their plans to murder David or have him murdered by others. They have also spoken to [E.F.C.] about plans to murder Jerry Cummings ([E.F.C.]'s father) or have him murdered by others. [E.F.C.] has been told that David and Jerry will be killed as revenge for prior incidents of abuse, including incidents of ritual satanic abuse, which Shari has repeatedly alleged were committed by David and Jerry. [E.F.C.] has repeatedly denied such abuse ever occurred.

---

[3] *David Michael Craig v. Shari Renee Bishop*, 19-207 (La.App. 3 Cir. 10/9/19), _ So.3d _.

It is believed that Shari has previously attempted to seriously harm, and possibly kill, David arsenic poisoning. David previously became seriously ill during the marriage with symptoms indicative of arsenic poisoning, and since the final separation of the parties he has tested positive for arsenic poisoning and has been receiving medical treatment. A criminal investigation into this poisoning is ongoing and Shari is the only known person of interest. This was testified to by multiple witnesses during the recent custody trial between the parties. It is also believed that Shari may have previously attempted to seriously harm, and possibly kill, one of her children with Jerry. That child, Israel Cummings, also became seriously ill following an incident with Shari and he later also tested positive for arsenic poisoning. This was testified to by multiple witnesses during the recent custody trial between the parties.

Over the past several years, while David and Shari were together, Shari spoke repeatedly about her desire to murder Jerry. She also asked David to kill Jerry for her at times. She has a long history of making false, and often completely unbelievable, allegations of abuse and criminal behavior against others. Shari has a long history of unstable and unpredictable behavior, and she has exhibited extremely poor judgment on numerous occasions. During the recent custody trial, she was held in contempt of court for violations of court orders, including violations when she took the child [D.M.C.] into hiding in Texas during the 2017 Christmas holiday in violation of several court orders. As a result, she was given a suspended 90 day jail sentence.

A separate petition was filed by Jerry against Shari on the same date, which requested a protective order based on the same primary factual scenario alleged herein.

On August 23, 2018, the trial court granted an ex parte TRO in favor of David. The TRO ordered Shari not to abuse, harass, assault, stalk, follow, track, monitor, or threaten David or D.M.C.; not to contact David by any means, except for court-ordered visitation; not to go within 100 yards of David or D.M.C., except for court-ordered visitation; to stay away from David's place of employment and D.M.C. school; not to damage any of their belongings or property or shut off their utilities, phone service, or mail delivery, or interfere with their living conditions; and not to interfere with the physical custody of D.M.C. A hearing was scheduled in this matter for September 7, 2018. A second TRO was issued by the trial court on September

7, 2018, effective through November 2, 2018, with a hearing set for October 31, 2018.

This matter was consolidated for trial purposes with Jerry's request for a protective order. On October 31, 2018, the trial court heard testimony from E.F.C.,[4] David, Jerry, Shari, and Mrs. Bishop.

The primary factual scenario supporting both petitions was recounted by E.F.C., based on a meeting between her and Shari on July 23, 2018, at the L'auberge Casino. E.F.C. testified that she met Shari and her grandmother, Mrs. Bishop, at L'auberge, despite the fact that she knew she needed her father's permission to see them. She stated that Shari had texted her that she and Mrs. Bishop were going to the casino and asked if she wanted to meet them there. She said that although she was staying with a friend, she was picked up by Mrs. Bishop and taken to the casino. She initially stated that both she and her friend were picked up by Mrs. Bishop, but then later claimed that her friend did not go with her. She further claimed that after visiting with Shari and Mrs. Bishop, she planned to meet up with her friend, who was spending the night at the casino with her mother.

E.F.C. testified that after she and Mrs. Bishop arrived at the casino, they ate and then walked around. She stated that they met Shari when they walked in front of a bar. She stated that Shari walked up to them, hugged her, and then pulled her into the bar. According to E.F.C., Shari was drunk. E.F.C. stated that Shari introduced her to a man, whom she said was a friend, and they sat down at a table. She stated that Mrs. Bishop did not accompany them into the bar.

E.F.C. testified that the man first asked her if she, her siblings, and D.M.C. were being abused by their fathers and then stated that he was in a biker gang and

---

[4] E.F.C. is Shari's minor daughter, born during her marriage to Jerry.

5

that he could have Jerry and David hurt or killed if they were being abused. E.F.C. stated that Shari was there for part of this conversation, but that she walked away after advising her to tell the truth about the abuse. E.F.C. testified that after Shari left, she told the man that none of the allegations were true. She stated that the man then asked her if Shari was telling him the truth or if she was crazy. E.F.C. said that she replied that Shari was not telling the truth. E.F.C. testified that at this point Mrs. Bishop walked up and told the man, "Well, I know that something's happening[.]" E.F.C. stated that she replied, "No, nothing's happening. It's not like that[.]" E.F.C. said that after these comments, she left the bar with Mrs. Bishop and then later met up with her friend at the casino. She stated that she did not see Shari again that night.

E.F.C. testified that her conversation with the man lasted from fifteen to thirty minutes and that she felt threatened by the conversation. She stated that she thought Shari had said that she had known the man a long time. She further stated that both Shari and the man were drunk. E.F.C. testified that she believed Shari was capable of having Jerry and David harmed and that she definitely believed that Shari asked this man to harm them because of her allegations of abuse.

E.F.C. testified that she told her father about this conversation, when he picked her up from her friend's home the next day. However, she admitted that she told him that she and Shari had met up accidently because she knew he would be mad at her.

E.F.C. further testified that Shari asked her to recant her testimony from the child custody hearing in which Jerry was granted custody of her and her siblings. She stated that she was pressured by Shari, Joshua Martin, Shari's former boyfriend, and his daughter to contact Shari's attorney. She said that they threatened to stop communicating with her unless she called the attorney. E.F.C. testified that when she spoke to the attorney, she was told that she would have to admit that she lied

6

about Shari giving her alcohol when she was with her. She stated that she did not recall telling the attorney that she had embellished a little on the stand or that she was worried about leaving her younger brother.

E.F.C. further recounted conversations she had the previous summer with Mr. Martin, who lived in Florida. She stated that he had been told by Shari that she and D.M.C. were being abused by their fathers and that both he and Shari had said that he wanted to protect her by getting rid of Jerry. E.F.C. testified that near the end of his relationship with Shari, Mr. Martin asked her if Shari's allegations were true and then said that he did not want to be with Shari if she was lying. E.F.C. stated that Mr. Martin told her that he would kill Jerry and David if the allegations were true. E.F.C. stated that she believed that Mr. Martin's desire to kill them was based both on Shari's request that he do so and his own feelings about the alleged abuse.

E.F.C. said that Mr. Martin claimed that either he or his friends would kill Jerry and David. She stated that he told her that he had friends who lived behind Jerry's home in Ragley, Louisiana. She claimed that he also told her that he had stalked both Jerry and David at their homes and that he was armed with a gun while outside of Jerry's home. E.F.C. testified that she felt threatened by this conversation and that she told Mr. Martin that Shari's allegations were not true.

E.F.C. testified that Shari kept advising her to tell Mr. Martin the truth about the abuse. Although she never heard Mr. Martin and Shari, together, say that they intended to kill Jerry and David, she stated that he admitted that Shari asked him to do so. She said that Shari had, in the past, said that she wanted to kill Jerry and David and that she was feeding Mr. Martin lies about them. At some point, E.F.C. testified that she became scared and told Jerry about her conversations with Mr. Martin. She stated that she took Mr. Martin's threats seriously the last time she spoke to him.

7

Jerry testified that he filed his petition for the protective order based on E.F.C.'s meeting with Shari at L'auberge Casino. He stated that she claimed that she had accidently bumped into Shari and Mrs. Bishop while she was there with her friend. She told him that Shari pulled her aside and introduced her to a man, who asked her if she and D.M.C. were being abused. He said that the man told E.F.C. that if the allegations of abuse were true, he had people who could take care of him and David that night.

Jerry testified that he learned of this incident the next day, but that E.F.C. initially told him that her meeting with Shari was accidental. However, after he filed a police report, he stated that she admitted that the meeting was planned. Jerry felt that E.F.C. initially lied about the logistics of the meeting because she knew she would be punished if he learned of their meeting. Jerry testified that Shari knew she was only allowed supervised visitation with E.F.C. pursuant to the custody order. He admitted that he had allowed her unsupervised visitation while she was married to David, but said that he stopped this visitation after they separated.

Jerry testified that E.F.C. also informed him of threats against him and David, which were voiced by Mr. Martin during conversations he had with her the previous June or July. He said that E.F.C. communicated with both Mr. Martin and his daughter and she said that she felt pressured by both to admit that he was abusing her. Jerry testified that E.F.C. reported that Mr. Martin promised to take care of him if the abuse allegations were true. He stated that E.F.C. further reported that Mr. Martin told her that he had driven by their home several times, and Shari told her, "You don't know how many times I've driven by your home." He said that E.F.C. only told him about these threats because she felt that she had failed to convince Mr. Martin that Shari was lying. Jerry testified that he reported these threats to law enforcement in both Calcasieu and Beauregard Parishes, but was told that he should

8

seek a restraining order. He said that he did not seek a restraining order because he was not represented by counsel at that point.

Jerry testified regarding various acts of physical abuse committed by Shari during their marriage. He stated that Shari slapped, punched, and shoved him, threatened him with bodily harm, and threatened his life. He said that she threw a knife, a vase, and a frying pan at him and that she hit him with a coffee cup. He said that during their custody fight, she told him that she would do whatever it took to take care of him. Jerry testified that he learned that she frequently drove by his home on the days she visited the children, and he stated that a third party told him that Shari believed that she would be justified in killing him based on a Bible verse. He stated that David informed him that he was asked by Shari to kill him, and his sons told him that she had expressed a desire to them to harm or kill him.

Jerry testified that during their marriage, Shari physically abused the children. He stated that he personally witnessed her hitting the children with coat hangers when she was angry, and the children reported similar incidents to him. He said that on one occasion, Shari claimed that a man attacked E.F.C. in their yard. He stated that E.F.C., who was approximately five years old at the time, never said who hit her. Jerry testified that he and several others were in the yard at the time of the alleged attack and would have seen if it had happened. He said that Shari was the only person around E.F.C. at the time, thus, she was the only one who could have hit her. He stated that since their divorce, Shari has continuously tried to convince E.F.C. that she is the subject of a ritual abuse pattern, which efforts have affected her emotionally.

Jerry testified that during their marriage, Shari asked him to kill Danny Meyers, whom she claimed was hurting their children. He stated that when he refused to do this, she left and hid the children from him for approximately six

9

months. Jerry testified that Shari eventually had a relationship with Mr. Meyers, supposedly in order to draw his interest away from the children. He stated that the children related that Mr. Meyers spent the night with Shari while they were in hiding.

Jerry testified that he absolutely believed that Shari poisoned his oldest son, Israel, and David with arsenic. He stated that he thought she poisoned Israel in an attempt to frame him for abuse. He said that he became concerned about Israel after Shari stated on Facebook that she was poisoning all of her children and, later, that she was poisoning Israel. Based on these statements, he stated that he took Israel for testing.

Jerry testified that he thought it most likely that Shari would convince someone to harm him rather than her doing it herself. He further stated that the fact that the children lived with him put them in the crosshairs of any violence committed against him should Shari successfully convince someone to attack him.

David testified that his petition for a protective order was also primarily based on E.F.C.'s July 23, 2018 meeting with Shari at the L'auberge Casino. He claimed that Shari posed a credible danger to him and D.M.C. based on her attempts to convince third parties to commit violence against him in his home. He stated that he has a genuine fear for his and D.M.C.'s safety as a result of her actions.

David described Shari as relentless and stated that during their marriage, she never stopped harassing Jerry or telling people that he was a child molester and a ritual abuser. He said that Shari asked him multiple times to kill Jerry because she claimed that he was abusing her children. David testified that he knew that she would act the same towards him after their custody fight and that this was confirmed to him by various people. He stated that although Shari claimed she was just joking with her boyfriend, Mr. Martin, about killing Jerry, she was not joking when she asked him to kill Jerry. He felt that based on the people Shari hung out with and her

ability to make them feel sorry for her, it was just a matter of time before she convinced someone to harm him and Jerry.

David further testified that he believed that Shari was capable of harming him herself. Although she was not violent towards him during their marriage, he stated that he was certain that she had poisoned both him and Israel with arsenic. He said that she was the only person he had ever heard talk about arsenic poisoning on a daily basis. He stated that this matter was currently being investigated by law enforcement and that she was the only person of interest in that investigation.

David testified that Shari has stalked him since their relationship ended and that she told him she was going to have him watched. He stated that he believed her based on conversations he had with her:

> Initially, I learned of her internet usage – if she wasn't looking up ritual abuse, devil worshiper stuff, she was searching people to find their backgrounds on the internet where I'd have random charges on my credit cards where she was doing background checks on myself, searching people, always – just non-stop, always digging, digging, digging.

He said that he was concerned that because she was a private investigator, she had added resources by which to stalk him.

David testified that since obtaining the TRO against Shari, the number of vehicles driving slowly past his home have decreased. He stated that he is worried that someone will attempt to snatch D.M.C. from his property.

Shari admitted that she met E.F.C. at L'auberge Casino on July 23, 2018; however, she stated that the meeting was not planned. Just before meeting E.F.C., she stated that she was conversing with a man in a bar at the casino. She stated that she did not know the man. Shari testified that during their conversation, he related that he had been abused by his father and she told him that her children were being

11

abused by Jerry and David. She stated that they also discussed legal loopholes and the means by which a child could be removed from an abusive situation.

Shari testified that while she and the man were talking, she saw her mother and E.F.C. walk by, so she went out and said hello and then E.F.C. and her mother sat down in the bar with them. She stated that she then left the bar for approximately four minutes, while she went to the restroom. Shari testified that E.F.C. and her mother were gone when she returned and that she did not know what they had discussed with the man during her absence. She stated that this was the only time she saw E.F.C. that day.

Shari admitted that she had been in a two-month relationship with Mr. Martin, a former co-worker, and that both he and his daughter communicated with E.F.C. during that time. While she denied knowing the substance of their conversations, she claimed that Mr. Martin spoke to E.F.C. like a father would speak to his child. Shari admitted that she told Mr. Martin that Jerry and David were abusing her children, and she was sure that Mr. Martin asked E.F.C. about the abuse. She further admitted that despite E.F.C.'s denial during the custody hearing, she and others, at her insistence, continued questioning her about Jerry abusing her. She said that she did so because E.F.C. lived with Jerry.

Shari testified that to her knowledge neither Mr. Martin nor the man at L'auberge spoke to E.F.C. about harming or killing David and Jerry. She claimed that E.F.C. took what the man said out of context based on the fact that Mrs. Bishop was present during this conversation. She further stated that based on her belief that E.F.C. lied during the custody hearing, she also believed that E.F.C. was told to interpret the conversation that way or she misunderstood it.

Shari admitted that she frequently stated, in the past, that she wanted to kill Jerry all the time; however, she explained that this was just a figure of speech. She

further admitted saying this to David, but she denied that she asked him to kill Jerry. She denied that she asked anyone to kill Jerry. She claimed that she was not the kind of person who would do such a thing. Shari further admitted that she joked with Mr. Martin about how she wanted Jerry gone, but she denied saying the same thing about David.

Shari testified that she is licensed as a private investigator in Texas and Louisiana. She stated that she was in the process of applying for her license in Florida and a concealed carry license in Louisiana, but that both applications were put on hold due to the claims by Jerry and David. She related that she had recently been fired from an investigator training job in Florida for the same reason. Shari testified that she has owned a Smith and Wesson Governor handgun for three months but claimed that she has never fired it due to defective firing pins. She stated that the gun is currently located in Tennessee, with Mr. Martin's brother, whose name she did not know. Shari testified that Mrs. Bishop purchased the gun for her to use in her work as a private investigator. However, she stated that whether she carried a gun depended on the type of investigative work she performed.

Mrs. Bishop testified that she and Shari spent the night at L'auberge on July 23, 2018, in order to celebrate their birthdays. She stated that after they arrived at the casino at approximately 6:00 p.m., Shari immediately went to the pool and she went shopping for Shari's birthday present. She said that while shopping, Shari called and informed her that E.F.C. had contacted her and that she and her friend wanted to come to swim at the casino. Mrs. Bishop testified that E.F.C. called her and they arranged for her to pick up E.F.C. and her friend.

Mrs. Bishop testified that she arrived at the friend's home at approximately 8:30 p.m. She stated that she discouraged E.F.C.'s friend from going with them because the casino's pool closed at 9:00 p.m., and she also discouraged E.F.C. from

13

spending the night at the hotel because she had only paid for two adults to stay in their room. She stated that they agreed that E.F.C. would visit with her and Shari at the casino and then would be returned to her friend's home.

Mrs. Bishop testified that she and E.F.C. arrived at the casino at approximately 9:30 p.m. She stated that Shari was very excited when she saw E.F.C. and gave her a hug. She said that she left E.F.C. with Shari, who took her into the bar where she was talking to a man, and she headed for her room. Mrs. Bishop testified that she had never met the man before, and she did not remember his name. She stated that she could tell that Shari had had a few drinks and that she assumed the man had also been drinking.

Mrs. Bishop testified that shortly after leaving the bar, she decided that she should not have left E.F.C. with Shari and the man, so she turned and went back to the bar. She stated that as she approached the bar, she met Shari, who was going to the restroom. She said that E.F.C. was still in the bar with the man. Mrs. Bishop claimed that she did not hear what E.F.C. and the man were talking about; however, she stated that the man said, "If this is real, this needs to be stopped." Mrs. Bishop testified that she responded, "When [E.F.C.] was telling people, nobody took her for real. Now she's older. She doesn't want to be bothered about it. She doesn't want to talk about it." Mrs. Bishop testified that she then grabbed E.F.C.'s hand and they left the bar. She stated that E.F.C. was only in the bar for approximately five minutes. She stated that she and E.F.C. went to their room and then to eat and that she had E.F.C. back at her friend's home by approximately 1:00 a.m.

Mrs. Bishop testified that E.F.C. did not go into detail about her conversation with the man and that she never said that he offered to kill Jerry and David. When asked if she thought that E.F.C. had lied about the conversation, Mrs. Bishop replied, "My granddaughter has been known to lie." She further denied that she asked Shari

about the conversation. She stated that there were some things that Shari did not tell her. Mrs. Bishop denied that she had ever heard Shari say that she wanted to kill Jerry and David, but admitted that she had heard her say that "it would be the Lord's revenge with whatever will happen to them." She claimed that Shari was angry and was just venting about the situation between her and her former and current husbands.

Mrs. Bishop testified that she had met Mr. Martin, who she said was disgusted and angry about Shari's allegations that Jerry and David had abused their children. However, she denied that he acted as though he wanted to kill them. She described his response as being a figure of speech. Conversely, she later testified that she could not recall ever discussing the abuse allegations with Mr. Martin.

Mrs. Bishop testified that Shari currently lived with her. She stated that Shari met Mr. Martin in Louisiana in May 2018, when they worked together and that they spent a couple of weeks together in Florida in July 2018. She said that Shari also worked as a private investigator for several weeks in Texas in August 2018.

When questioned as why she took E.F.C. to the casino to see Shari, despite the fact that Shari was only allowed supervised visitation pursuant to the custody order, Mrs. Bishop first stated that she thought the order was now invalid because Jerry had allowed Shari unsupervised visitation during her marriage to David. When asked if she should have obtained Jerry's permission before taking E.F.C. to the casino, Mrs. Bishop first answered, "Do you really think he would have let her come see us?" She then stated, "I honestly didn't think about it." Mrs. Bishop further testified that even though she knew that the pool would be closed by the time she and E.F.C. arrived at the casino, she still agreed to bring her to the casino so she and Shari could visit with her. However, she previously admitted that although she loved E.F.C., she wanted to spend time with Shari, so she delayed an hour before leaving to pick up E.F.C., even though Shari was at the pool and she was shopping. Mrs.

Bishop finally testified that she thought the trial court wronged Shari by awarding Jerry custody of the children.

At the close of the October 31, 2018 hearing, the trial court issued an oral ruling, granting protective orders in favor of Jerry and David, as follows:

> After hearing the testimony, I have a few comments. I would say that I do think it's really sad that [E.F.C.] cannot have a relationship with her mother, because I believe that she probably wants that, and as a girl she probably wants that, but there's no doubt in my mind that her mother is continuing to say inappropriate things and has done the thing that she testified to and talked to other people about it and pressuring her to recant her story or to tell inappropriate things, and I'm sure there are occasions that [E.F.C.] goes along with that for the reasons she stated on the – when she took the stand, which was, you know, to be able to have a relationship with her mom, but she instead gets twisted in this mental thing because her mother, I think, twists her mind and then she gets herself too deep, and she ends up with something like this where she's out at the wrong place at the wrong time and totally exposed to inappropriate things.

> You know, whether it was temporary custody or permanent custody Jerry had, whether it was Whistle Stop visits or what, I mean, there was – what went down was absolutely totally inappropriate, and to know the grandmother was involved, too, taking the child at 14 years old to a casino, leaving them with somebody who's drinking and their mother who's drinking and some strange man and was going to bring them home at 12:00 and never confirmed with the friend's parents that they were even home. I mean, that's just, to me, every example of what a parent should not be and just gives more reason why custody would never be appropriate with the mother, but I don't believe for a second that [E.F.C.] would get up on the stand and lie when all she did was end up in trouble and got the consequences she did. I mean, it makes no sense that she would lie to dig herself deeper and get in more trouble. So, I believe that she was telling the truth.

> Yes, there's different versions on whether they ate first or after, spent the night at this place or that place, but I think it's pretty clear what her testimony is, and it's really interesting to be consistent with the same type testimony that she said about Joshua, the same kind of conversations on more than one occasion, and I think there's clearly anger and frustration in that family, and unfortunately it should be – the efforts and that anger should be put in a different place. It should be working on how you can mend those issues and get it right instead of retaliating and being vindictive and getting back, and it goes back to the same things that have always been said inappropriately to those children. Every time there's time that she's with them, like Israel at the beach, something gets done and something's inappropriate, and the kid's mind's trying to be twisted, and I think it's just sad because I think

16

you're just killing your kids, and they'd love to probably have a relationship with the mom if she knew how to have a good one, but for all the reasons that I think were evidenced today, I think that it's clear that there is certainly a risk for the mom to be around these people, strangers you meet in the bar, stories, and whether she believes they're true or not, she tells them and gets them talking to the kids. It's so inappropriate, everything about it, and I think a protective order is never more appropriate to be issued. And what would it do? No, it may not prevent a third party, but maybe it will teach the mom to shut her mouth and not say inappropriate things to the kids and not say things to strangers on the street or some boyfriend she has that month, because it's all going to go right back and be directed right back at her as the source of the problem, because the guy in the bar doesn't know any stories about David Craig and Jerry Cummings unless Shari tells them. So, I'm going to grant the protective order.

(Indentation and paragraph breaks added.)

The protective orders, effective through April 30, 2020, continued the prohibitions from the prior TROs and ordered Shari to pay all court costs and attorney fees in the amount of $1,500.00. Shari was further ordered to seek professional counseling and/or to complete a court-monitored domestic abuse intervention program. It is from these protective orders that Shari has appealed.

On appeal, Shari raises two assignments of error in both appeals:

I. The trial court erred in granting the protective order because the acts Defendant is alleged to have committed are not within the scope of the Domestic Abuse Assistance Act pursuant to La. R.S. 46:2131, et seq.

II. The trial court erred in granting the protective order because Plaintiff failed to prove an immediate and present danger of domestic abuse.

## OPINION

Persons subject to domestic abuse are provided protection through temporary restraining orders and protective orders under the Protection from Family Violence Act via La.R.S. 46:2131-2143. "The purpose behind the entire legislative scheme . . . is to provide relief to victims of domestic violence by establishing 'a civil remedy for domestic violence which will afford the victim immediate and easily accessible

protection.'" *Bays v. Bays*, 00-1727, p. 5 (La. 2/21/01), 779 So.2d 754, 758 (quoting La.R.S. 46:2131).

Domestic abuse as defined in La.R.S. 46:2132(3), "includes but is not limited to physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family member, household member, or dating partner against another." Louisiana Revised Statutes 46:2135(A) (emphasis added) provides, relative to TROs, that:

> Upon good cause shown in an ex parte proceeding, the court may enter a temporary restraining order, without bond, as it deems necessary to protect from abuse the petitioner, any minor children, or any person alleged to be an incompetent. *Any person who shows immediate and present danger of abuse shall constitute good cause for purposes of this Subsection.* The court shall consider any and all past history of abuse, or threats thereof, in determining the existence of an immediate and present danger of abuse. There is no requirement that the abuse itself be recent, immediate, or present.

The jurisprudence has held that the good cause requirement applicable to TROs also applies to actions seeking protective orders. *S.L.B. v. C.E.B.*, 17-978, 19-979, 19-980 (La.App. 4 Cir. 7/27/18), 252 So.3d 955, *writ denied*, 18-1442 (La. 11/20/18), 256 So.3d 992.

A protective order may be granted "to bring about a cessation of domestic abuse as defined in R.S. 46:2132, or the threat or danger thereof, to a party, any minor children, or any person alleged to be incompetent[.]" La.R.S. 2136(A). It may be granted either through a consent agreement or following a hearing that affords due process to the non-requesting party. La.R.S. 46:2136(B). The relief granted by a protective order may include, but is not limited to, the following:

> (1) Granting the relief enumerated in R.S. 46:2135.

> (2) Where there is a duty to support a party, any minor children, or any person alleged to be incompetent living in the residence or household, ordering payment of temporary support or provision of

18

suitable housing for them, or granting possession to the petitioner of the residence or household to the exclusion of the defendant, by evicting the defendant or restoring possession to the petitioner where the residence is solely owned by the defendant and the petitioner has been awarded the temporary custody of the minor children born of the parties.

(3) Awarding temporary custody of or establishing temporary visitation rights and conditions with regard to any minor children or person alleged to be incompetent.

(4)(a) Ordering either a medical or mental health evaluation or both of the perpetrator to be conducted by an independent court-appointed evaluator who qualifies as an expert in the field of domestic abuse. The evaluation shall be conducted by a person who has no family, financial, or prior medical or mental health relationship with the perpetrator or his attorney of record.

(b) After a medical or mental health evaluation has been completed and a report issued, the court may order counseling or other medical or mental health treatment as deemed appropriate.
A protective order

La.R.S. 46:1236(A).

The relief granted pursuant to La.R.S. 46:2135(A), includes, but is not limited

to:

(1) Directing the defendant to refrain from abusing, harassing, or interfering with the person or employment or going near the residence or place of employment of the petitioner, the minor children, or any person alleged to be incompetent, on whose behalf a petition was filed under this Part.

(2) Awarding to a party use and possession of specified jointly owned or leased property, such as an automobile.

(3) Granting possession to the petitioner of the residence or household to the exclusion of the defendant, by evicting the defendant or restoring possession to the petitioner where:

(a) The residence is jointly owned in equal proportion or leased by the defendant and the petitioner or the person on whose behalf the petition is brought;

(b) The residence is solely owned by the petitioner or the person on whose behalf the petition is brought; or

(c) The residence is solely leased by defendant and defendant has a duty to support the petitioner or the person on whose behalf the petition is brought.

(4) Prohibiting either party from the transferring, encumbering, or otherwise disposing of property mutually owned or leased by the parties, except when in the ordinary course of business, or for the necessary support of the party or the minor children.

(5) Awarding temporary custody of minor children or persons alleged to be incompetent.

(6) Awarding or restoring possession to the petitioner of all separate property and all personal property, including but not limited to telephones or other communication equipment, computers, medications, clothing, toiletries, social security cards, birth certificates or other forms of identification, tools of the trade, checkbooks, keys, automobiles, photographs, jewelry, or any other items or personal effects of the petitioner and restraining the defendant from transferring, encumbering, concealing, or disposing of the personal or separate property of the petitioner.

(7) Granting to the petitioner the exclusive care, possession, or control of any pets belonging to or under the care of the petitioner or minor children residing in the residence or household of either party, and directing the defendant to refrain from harassing, interfering with, abusing or injuring any pet, without legal justification, known to be owned, possessed, leased, kept, or held by either party or a minor child residing in the residence or household of either party.

A trial court's determination granting or denying a protective order will not be reversed on appeal absent an abuse of discretion. *Pellerano v. Pellerano*, 17-302 (La.App. 1 Cir. 4/12/19), 275 So.3d 947. In order to reverse, an appellate court "must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong." *State in the Interest of C.D.*, 18-834, p. 11 (La.App. 4 Cir. 12/19/18), 262 So.3d 929, 934, *writ denied*, 19-120 (La. 3/6/19), 266 So.3d 903. As fact finder, the trial court "is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error." *Pellerano*, 275 So.3d at 950.

### *Assignment of Error Number One*

In her first assignment of error, Shari argues that the trial court erred in granting the protective orders because the crime of solicitation of murder is not listed

as an offense against the person in the Criminal Code of Louisiana. However, we find no merit in this argument.

Although La.R.S. 46:2132(3) defines domestic abuse as "physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation," the definition begins with the modifying language "includes but is not limited to[.]" This language renders the rule of statutory construction, "*expressio unius est exclusio alterius*," inapplicable. That maxim provides that "the expression of one thing is the exclusion of the other." However, "[t]he word 'include' in a statute generally signals that entities not specifically enumerated are not included." Norman J. Singer and Shambie Singer, 2A Sutherland Statutes and Statutory Construction, § 47:25 (7th Ed. 2010 & Supp. 2018). But here, the language in the domestic abuse definition specifically states that it is not limited to the enumerated actions.

Thus, we find that the definition of domestic abuse is broad enough to include the crime of solicitation of murder, which is defined as "the intentional solicitation by one person of another to commit or cause to be committed a first or second degree murder." La.R.S. 14:28.1. Furthermore, by counseling others to commit a crime, Shari, as a principal, could be charged with other crimes that qualify as offenses against the person in the Criminal Code of Louisiana, such as first and second degree murder, aggravated assault, aggravated battery, etc. La.R.S. 14:24. Accordingly, we find no merit in this assignment of error.

### Assignment of Error Number Two

In her second assignment of error, Shari argues that the trial court erred in granting the protective orders because neither David nor Jerry proved an immediate and present danger of domestic abuse, as required by La.R.S. 46:2136. We disagree.

21

During the hearing, the trial court pointed out that the differences in the facts as recounted by E.F.C., Shari, and Mrs. Bishop and found E.F.C. to be the more credible of the three witnesses. As the trial court was in the best position to evaluate the witnesses' demeanor, we will not reverse those credibility determinations on appeal. Both Shari and Mrs. Bishop admitted that a discussion occurred between Shari and the man about the alleged abuse committed by Jerry and David. Shari further admitted that she discussed these allegations with Mr. Martin.

In granting the protective orders, the trial court obviously found that David and Jerry proved that there was an immediate and present danger of abuse based on Shari's propensity for discussing her abuse allegations with any person she meets, as shown by all the witnesses who testified during the hearing. She prodded Jerry to kill Mr. Meyers, she prodded David to kill Jerry, and she prodded Mr. Martin and the man at the casino to kill Jerry and David. Furthermore, her discussions with Mr. Martin and the man at the casino took place one month before David and Jerry filed their petitions for protective order. Thus, based on the trial court's credibility determinations, we find no abuse of discretion in its judgments granting protective orders in favor of David and Jerry.

## DISPOSITION

For the foregoing reasons, the judgment of the trial court granting a protective order in favor of David Michael Craig is affirmed. The costs of this appeal are assessed to Shari Bishop.

**AFFIRMED.**